683 F.2d 752
 17 ERC 1721, 12 Envtl. L. Rep. 20,833
 NATURAL RESOURCES DEFENSE COUNCIL, INC., 1725 I Street,
N.W., Suite 600, Washington, D. C. 20006, Petitioner,
v.
U. S. ENVIRONMENTAL PROTECTION AGENCY, 401 M. Street, S.W.,
Washington, D. C. 20460, Respondent,
Chemical Manufacturers Association; American Cyanamid
Company; FMC Corporation& Union Carbide Corp.; Ford Motor
Company; American Paper Institute & National Forest Products
Association; Chicago Association of Commerce & Industry;
Illinois Manufacturers' Association & Mid-America Legal
Foundation, Intervenors.
 No. 81-2068.
 United States Court of Appeals,
Third Circuit.
 Argued May 11, 1982.
Decided July 8, 1982.
 
 Frances Dubrowski, Natural Resources Defense Council, Inc., Washington, D. C., (argued), for petitioner.
 
 
 1
 Nancy J. Marvel (argued), Donald W. Stever, Jr., Attys., Dept. of Justice, Carol E. Dinkins, Asst. Atty. Gen., Michael Murchison, Atty., E.P.A., Washington, D. C., for respondent; Rotraud M. Perry, Gen. Counsel, Bruce Diamond, Susan Lepow, Attys., E.P.A., Washington, D. C., of counsel.
 
 
 2
 Lawrence T. MacNamara, Jr. (argued), Theodore L. Garrett, Corinne A. Goldstein, Covington & Burling, for Chemical Manufacturers Ass'n; Edmund B. Frost and Sanford E. Gaines, Washington, D. C., for counsel.
 
 
 3
 Turner T. Smith, Jr. (argued), T. S. Ellis, III, William B. Ellis, Douglas E. Cutler, Norman W. Bernstein, E. Milton Farley, III, Richard W. Goldman, Hunton & Williams, Richmond, Va., for Ford Motor Co.
 
 
 4
 Michael K. Glenn, Gary R. Feulner, Chadbourne, Park, Whiteside & Wolff, Washington, D. C., for American Paper Institute & National Forest Products Ass'n.
 
 
 5
 John M. Cannon, Tinley Park, Ill., Susan W. Wanat, Park Ridge, Ill., Mid-America Legal Foundation, for Chicago Ass'n of Commerce and Industry, Illinois Manufacturers' Ass'n & Mid-America Legal Foundation.
 
 
 6
 Before GIBBONS, HUNTER, Circuit Judges and THOMPSON,* District Judge.
 
 OPINION OF THE COURT
 
 7
 JAMES HUNTER, III, Circuit Judge.
 
 
 8
 Petitioner Natural Resources Defense Council ("NRDC") challenges the action of the Environmental Protection Agency ("EPA") in indefinitely postponing the effective date of final amendments ("the amendments") to certain regulations without complying with the notice and comment rulemaking requirements of the Administrative Procedure Act ("APA").[1] For the reasons which follow, we will order that EPA reinstate all of the amendments, effective March 30, 1981.[2]I. Background
 
 
 9
 In this suit, NRDC, pursuant to 33 U.S.C. § 1369(b)(1),[3] seeks review of the procedures employed by EPA in deferring indefinitely the effective date of a set of amendments to regulations dealing with the discharge of toxic pollutants into publicly owned treatment works ("POTWs").[4] The regulations and amendments were promulgated pursuant to section 307(b)(1) of the Clean Water Act, 33 U.S.C. § 1317(b)(1), which provides, in part:
 
 
 10
 The Administrator shall, within one hundred and eighty days after October 18, 1972, and from time to time thereafter, publish proposed regulations establishing pretreatment standards for introduction of pollutants into treatment works ... which are publicly owned for those pollutants which are determined not to be susceptible to treatment by such treatment works or which would interfere with the operation of such treatment works. Not later than ninety days after such publication, and after opportunity for public hearing, the Administrator shall promulgate such pretreatment standards. Pretreatment standards under this subsection shall specify a time for compliance not to exceed three years from the date of promulgation and shall be established to prevent the discharge of any pollutant through treatment works ... which are publicly owned, which pollutant interferes with, passes through, or otherwise is incompatible with such works.
 
 
 11
 The Clean Water Act thus mandates the promulgation by EPA of regulations requiring that industries pretreat waste by removing pollutants before discharging the waste into POTWs.[5] Pursuant to that mandate and to a consent decree,[6]
 
 
 12
 (o)n February 2, 1977, EPA proposed a rule which would establish mechanisms and procedures for enforcing national pretreatment standards controlling the introduction of wastes from non-domestic sources into publicly owned treatment works (POTWs). On June 26, 1978, after more than a year of consideration during which time 4 public hearings and 16 public meetings were held and more than 400 individual comments received, the Agency promulgated the final general pretreatment regulations, 40 CFR Part 403.
 
 
 13
 46 Fed.Reg. 9404 (January 28, 1981). The General Pretreatment Regulations for Existing and New Sources, 40 C.F.R. Part 403 ("the 1978 regulations") became effective on August 28, 1978, 43 Fed.Reg. 27736 (1978), and have remained in effect ever since.
 
 
 14
 On October 29, 1979, EPA proposed a set of amendments to the 1978 regulations.[7] After "considering numerous comments submitted on the proposed changes," EPA promulgated those amendments on January 28, 1981 in "final form." 46 Fed.Reg. 9404 (January 28, 1981).[8] EPA designated March 13, 1981, as the effective date of the amendments, and, pursuant to 40 C.F.R. § 100.01, established February 10, 1981, as the date of the regulations "for the purposes of judicial review." 46 Fed.Reg. 9404 (January 28, 1981).
 
 
 15
 On January 29, 1981, the President of the United States issued a memorandum ordering that the effective dates of all regulations which were final but not yet effective be postponed for a period of sixty days from the date of the memorandum. 46 Fed.Reg. 11227 (February 6, 1981). Pursuant to that order, the effective date of the amendments at issue here was postponed from March 13, 1981 to March 30, 1981. 46 Fed.Reg. 11972 (February 12, 1981). No challenge has been made to that postponement.
 
 
 16
 On February 17, 1981, the President issued Executive Order 12291 ("E.O. 12291"). 46 Fed.Reg. 13193-13198 (February 19, 1981). Section 2 of E.O. 12291 stated that administrative action must be based on adequate information "concerning the need for and consequences of proposed government action," that no action should be taken unless the potential benefits of the regulatory action would outweigh the costs to society, that the agency should maximize the net benefits to society by its regulatory action, that the agency should choose the regulatory action involving the least net cost to society, and that the agency action should maximize the "aggregate net benefits to society, taking into account the condition of the particular industries affected by regulations, the condition of the national economy, and other regulatory actions contemplated for the future." Section 3 of E.O. 12291 required that all "major rules"[9] be accompanied by a Regulatory Impact Analysis ("RIA") in order to implement Section 2.
 
 
 17
 Section 7 of E.O. 12291 dealt with regulations which had been published in final form but which had not yet taken effect. Sections 7(a) and (d) provide:
 
 
 18
 (a) To the extent necessary to permit reconsideration in accordance with this Order, agencies shall, except as provided in Section 8 of this Order, suspend or postpone the effective dates of all major rules that they have promulgated in final form as of the date of this Order, but that have not yet become effective, excluding:
 
 
 19
 (1) Major rules that cannot legally be postponed or suspended;
 
 
 20
 (2) Major rules that, for good cause, ought to become effective as final rules without reconsideration....(d) Agencies may, in accordance with the Administrative Procedure Act and other applicable statutes, permit major rules that they have issued in final form as of the date of this Order, and that have not yet become effective, to take effect as interim rules while they are being reconsidered in accordance with this Order, provided that, agencies shall report to the Director, no later than 15 days before any such rule is proposed to take effect as an interim rule, that the rule should appropriately take effect as an interim rule while the rule is under reconsideration.
 
 
 21
 Despite the fact that EPA apparently took the position initially that the amendments were not "major rules," and thus were not subject to E.O. 12291, appendix at 24-25, 28, the Acting Administrator of EPA signed an order on March 27, 1981, which was published in the Federal Register of April 2, 1981, eliminating the March 30, 1981 effective date of the amendments and postponing them indefinitely. That action was "taken pursuant to Executive Order 12291." 46 Fed.Reg. 19936 (April 2, 1981). This was the sole reason given for the postponement.
 
 
 22
 One of the amendments proposed on October 29, 1979, and postponed indefinitely pursuant to E.O. 12291, was the Combined Wastestream Formula ("CWF"), 40 C.F.R. § 403.6(e), which merits separate mention here.[10] In 1979, EPA established categorical pretreatment regulations governing the discharge of pollutants into POTWs by the electroplating industry. 40 C.F.R. Part 413, Electroplating Point Source Category.[11] Title 40 C.F.R. § 413.01(a) provides:
 
 
 23
 This part shall apply to electroplating operations in which metal is electroplated on any basis material and to related metal finishing operations as set forth in the various subparts, whether such operations are conducted in conjunction with electroplating, independently or part of some other operation. The compliance deadline for integrated facilities shall be 3 years from the effective date of 40 CFR 403.6(e). The compliance deadline for non-integrated facilities shall be May 12, 1983 (since amended to January 28, 1984, 46 Fed.Reg. 43972 (September 2, 1981) ).
 
 
 24
 (Emphasis added.)[12]
 
 
 25
 EPA described the impact of the postponement of the effective date of the amendments on integrated electroplating facilities:
 
 
 26
 The deferral of the effective date of the amendments to the general pretreatment regulations is of special significance to the electroplating pretreatment standards. First, under § 413.01 of the electroplating standards, the compliance date for integrated facilities is three years from the effective date of the combined wastestream formula contained in § 403.6(e) of the amendments to the general pretreatment regulations. Since the effective date of this provision has been deferred, so too has the compliance date for integrated facilities under the electroplating pretreatment standards.
 
 
 27
 46 Fed.Reg. 43973 (September 2, 1981). See 33 U.S.C. § 1317(b)(1) ("compliance not to exceed three years from the date of promulgation (of a pretreatment standard)"). The indefinite postponement of the CWF thus brought with it the indefinite postponement of the obligation of integrated electroplating facilities to comply with the categorical pretreatment standards applicable to the electroplating industry.
 
 
 28
 On June 24, 1981, NRDC filed suit under 33 U.S.C. § 1369(b)(1) seeking review of EPA's action in deferring the amendments indefinitely without holding an APA notice and comment period.[13]
 
 
 29
 On October 5, 1981, published October 13, 1981, EPA "decided to terminate the indefinite postponement of the general pretreatment amendments and make them effective January 31, 1982." 46 Fed.Reg. 50502 (1981).[14] On October 13, 1981, EPA also published a notice of rulemaking:
 
 
 30
 By separate action taken this day, EPA has announced that the general pretreatment amendments will be effective January 31, 1981 (sic; should read "1982"). As an adjunct to this announcement, EPA, through this notice, proposes to further suspend the effective date of the general pretreatment amendments and invites comment on whether the effective date of the general pretreatment amendments (or specific portions thereof) should be further postponed.
 
 
 31
 EPA has not yet conducted a rulemaking on the desirability and appropriate scope of the deferral. Therefore, in order to provide a full public airing of the issue, EPA is hereby initiating a rulemaking on whether the effective date of the amendments should be further postponed and, if so, which portions and for how long.
 
 
 32
 46 Fed.Reg. 50503 (1981). Thus, EPA treated the further postponement of the amendments as a rule subject to the rulemaking provisions of the APA, despite the fact that it did not treat the initial postponement as a rule.
 
 
 33
 In an order signed on January 27, 1982 and published in the Federal Register on February 1, 1982, EPA spoke as follows:
 
 
 34
 On January 28, 1981, the Environmental Protection Agency promulgated amendments to the General Pretreatment Regulations.... On March 27, 1981, the effective date of these amendments was indefinitely postponed to enable the Agency to conduct a Regulatory Impact Analysis under Executive Order 12291 (citation omitted).
 
 
 35
 On October 13, 1981, (citation omitted), EPA announced its decision to terminate the indefinite suspension of the pretreatment amendments, making them effective January 31, 1982. In a separate action also taken on October 13, the Agency initiated a rulemaking and invited public comment on the issue of whether all of (sic) specified portions of the amendments should be further postponed (citation omitted).
 
 
 36
 EPA has decided that a number of the general pretreatment amendments will become effective on January 31, 1982. The effective date of (§ 403.3(i) (definition of interference), § 403.3(n) (definition of pass through), § 403.6(e) (combined wastestream formula), and § 403.7 (revision of categorical pretreatment standards to reflect POTW removal of pollutants) ) will be further postponed pending continued analysis (and deferred until further notice).
 
 
 37
 47 Fed.Reg. 4518 (February 1, 1982). After summarizing the comments received on the question of further postponement, EPA continued:EPA disagrees with the positions that all of the amendments to the (General Pretreatment Regulations) should be deferred beyond January 31, or that they should all become effective on that date. As noted above, EPA has decided to put into effect a majority of the amendments. Today's action is guided by the recognition that the amendments to the general pretreatment regulations represent an improvement over the 1978 pretreatment regulations. They are the result of a lengthy and intensive development process. They clarify ambiguous provisions in the 1978 regulations, resolve inconsistencies in those requirements, and generally inject added flexibility into the pretreatment program.
 
 
 38
 When EPA indefinitely postponed the amendments to the General Pretreatment Regulations on March 27, 1981, it was with the implicit assumption that such postponement was necessary to the reevaluation of the general pretreatment program. One result of the postponement was that it caused the 1978 regulations to remain in effect, even though the amendments significantly improved upon certain portions of the original regulations. During the course of the regulatory impact analysis regulated entities and the public have consequently been deprived of the beneficial changes made by those amendments. With the exception of a few provisions which will be further postponed, EPA believes that letting the amendments go into effect will enhance the operation of the pretreatment program pending completion of the regulatory analysis. Although EPA is currently considering changes to the National Pretreatment Program, this will be a complex and lengthy procedure. In the interim, these amendments fulfill Congressional mandates for national requirements while allowing POTW's sufficient flexibility to adapt to individual situations.
 
 
 39
 47 Fed.Reg. 4519-20 (February 1, 1982) (emphasis added). EPA then pointed out that, while most of the amendments to go into effect were "noncontroversial," the four amendments which would be further deferred were "highly controversial." EPA continued:
 
 
 40
 The Agency would like to make it clear that it does not consider today's action to be inconsistent with the regulatory analysis it is presently conducting on the pretreatment program.... It simply believes that while this analysis is being completed, the regulated community and the public would be best served by the improved provisions of the 1981 amendments....
 
 
 41
 Since today's action does not close the door on the potential for other changes to the national pretreatment program, the Agency is not addressing those portions of the comments which explicitly suggested changes in the shape of the pretreatment program or the Clean Water Act. These concerns will be considered and addressed in the RIA process. Similarly, the Agency is not addressing those portions of the comments which made detailed criticisms of specific amendments. Those comments were either already responded to in the rulemaking which concluded January 28, 1981, or, in the case of the four provisions which will continue to be deferred, will be considered as the Agency evaluates the RIA.
 
 
 42
 47 Fed.Reg. 4520-21 (February 1, 1982). EPA concluded by stating that its action published February 1, 1982, was not a major rule, "because it imposes no new obligations," and therefore was not itself subject to E.O. 12291. 47 Fed.Reg. 4521 (1982).
 
 II. Discussion
 A. Jurisdiction
 Mootness
 
 43
 EPA and the intervenors contend that this case is moot and should be dismissed for that reason. We do not agree that this case is moot in its entirety. If we were to conclude that EPA's action in indefinitely deferring the effective date of the amendments without adhering to the requirements of the APA was impermissible, one possible form of relief would be an order requiring EPA to reinstate all of the amendments, including the four which are not yet in effect, as of March 30, 1981. If the granting of that relief would not alter the status quo, as it exists today, then this case might well be moot. However, such relief would change the status quo, because (1) the four amendments which are not yet in effect would become effective as of March 30, 1981, and (2) the CWF would be in effect, as of March 30, 1981, which would mean that integrated electroplating facilities would have until March 30, 1984, to comply with the electroplating categorical pretreatment standards.
 
 
 44
 Because this court could order relief in this case which would cure an injury which would otherwise continue to exist, this case is not moot. See United States Parole Commission v. Geraghty, 445 U.S. 388, 395-397, 100 S.Ct. 1202, 1208-1209, 63 L.Ed.2d 479 (1980).[15]
 
 Jurisdiction in the Court of Appeals
 
 45
 Ford contends that this court has no jurisdiction over this case, because the action of EPA in postponing the amendments was interlocutory and therefore may only be challenged in federal district court. The core of Ford's argument is that because EPA's action was taken on March 27, 1981, before the March 30 effective date of the amendments, it was at most a decision not to promulgate the amendments, and not final action affecting final rules.[16] Relying on Commonwealth of Pennsylvania Department of Environmental Resources v. EPA, 618 F.2d 991 (3d Cir. 1980), Ford argues that if this is a viable suit at all, jurisdiction lies in the federal district courts and not in the Court of Appeals.
 
 
 46
 We disagree. The amendments were subject to judicial review in the Court of Appeals as of February 10, 1981. To argue that they were not final for purposes of being altered by EPA renders illusory their finality for purposes of judicial review. If an agency could simply alter its regulations at any time between their final promulgation and their effective date, that agency would be able to moot a challenge to its "final" regulations at any time simply by altering them substantively or by postponing their effective date indefinitely. Moreover, under 5 U.S.C. § 553(d), an agency must publish a final rule not less than 30 days before its effective date. To argue that an alteration is interlocutory because the rule remains "proposed" until the thirty day period has run vitiates the purpose behind the thirty day requirement of § 553(d).
 
 
 47
 In Consumer Energy Council of America v. Federal Energy Regulatory Commission, 673 F.2d 425 (D.C.Cir.1982) ("CECA "), the intervenors argued that FERC's action in revoking a regulation which had been published in final form after completion of the notice and comment period but which would only go into effect thirty days later, was not a repeal, but was rather the revocation of " 'proposed regulations' " not subject to the APA. The court rejected this argument, stating that the regulation was a "final rule," and that the rule was not "any less final" because it had not gone into effect.[17] Id. at 446 n. 74.
 
 
 48
 Thus, the court in CECA decided that the rule at issue in that case was a final rule, even though it would not go into effect until thirty days later. This answers Ford's argument that EPA's action in postponing the effective date of the amendments was interlocutory because the amendments had not yet gone into effect. The amendments were final when they were published in final form on January 13, 1981, even though they were not scheduled to go into effect until March. Thus, the action of EPA in postponing their effective date indefinitely was a final action, and not interlocutory. Because that action was a final action, it is reviewable in this court.[18]
 
 
 49
 Here, the rulemaking process was complete, the amendments had been published in final form as a "final rule," and the rule was subject to judicial review. The action of EPA in postponing them indefinitely was a final action, and review properly lies in this court.
 
 B. The Merits
 Standard of Review
 
 50
 In this petition, NRDC challenges the failure of EPA to comply with APA notice and comment procedures when it indefinitely postponed the amendments. "(R) eview of an agency's procedural compliance with statutory norms is an exacting one." NRDC v. SEC, 606 F.2d 1031, 1048 (D.C.Cir.1979). The exacting standard applicable in determining whether an agency has failed to comply with the procedural requirements for its action contrasts with the deferential standard applicable to substantive challenges to agency action. Id. at 1049; see Lukens Steel Co. v. Klutznick, 629 F.2d 881, 885-86 (3d Cir. 1980) (deferential standard of review for substance of agency action). However, even though substantive agency actions are entitled to deference, and the scope of review of such actions is narrow, "sharp changes of agency course constitute 'danger signals' to which a reviewing court must be alert." State Farm Mutual Automobile Insurance Co. v. DOT, 680 F.2d 206, at 220 (D.C.Cir.1982).
 
 
 51
 Where an agency has sharply changed its substantive policy, then, judicial review of its action, while deferential, will involve a scrutiny of the reasons given by the agency for the change. Here, NRDC has mounted a procedural attack on an agency's action. Review of the procedural aspects of an agency decision is more broad in any event than review of the substantive contents of an agency action. As with substantive review, however, it makes sense to scrutinize the procedures employed by the agency all the more closely where the agency has acted, within a compressed time frame, to reverse itself by the procedure under challenge. In this case, the agency, without notice and the opportunity for comment, abrogated rules which had been proposed, which had undergone years of notice and comment procedures, and which had been promulgated, with an effective date, in final form.[19] By postponing the effective date of the amendments, EPA reversed its course of action up to the postponement. That reversal itself constitutes a danger signal. Where the reversal was accomplished without notice and an opportunity for comment, and without any statement by EPA on the impact of that postponement on the statutory scheme pursuant to which the amendments had been promulgated, the reviewing court must scrutinize that action all the more closely to insure that the APA was not violated.
 
 
 52
 The Applicability of the Administrative Procedure Act
 
 
 53
 In this case, EPA postponed the effective date of the amendments indefinitely, after those amendments had undergone notice and comment procedures, had been published in final form (including a "final" effective date), and had become final for purposes of judicial review. Both Ford and the Chemical Manufacturers' Association (but not EPA) contend that the indefinite postponement was not a rule, and therefore was not subject to the rulemaking requirements of the APA. Thus, the first question we must confront in ascertaining the legality of EPA's action is whether the APA rulemaking procedures apply at all in this case. In other words, where a rule has been published in final form after undergoing the notice and comment procedures required by the APA, and has become final for all purposes, may the agency promulgating the rule postpone it indefinitely without subjecting that indefinite postponement to the notice and comment procedures of the APA?[20]
 
 
 54
 We conclude that, under the facts of this case, EPA's action in indefinitely postponing the effective date of the amendments fit the definition of "rule" in the APA, and, as such, was subject to the APA's rulemaking requirements.[21] In general, an effective date is "part of an agency statement of general or particular applicability and of future effect." It is an essential part of any rule: without an effective date, the "agency statement" could have no "future effect," and could not serve to "implement, interpret, or prescribe law or policy." In short, without an effective date a rule would be a nullity because it would never require adherence.
 
 
 55
 If the effective date were not "part of an agency statement" such that material alterations in that date would be subject to the rulemaking provisions of the APA, it would mean that an agency could guide a future rule through the rulemaking process, promulgate a final rule, and then effectively repeal it, simply by indefinitely postponing its operative date. The APA specifically provides that the repeal of a rule is rulemaking subject to rulemaking procedures. Thus, a holding that EPA's action here was not a rule subject to the rulemaking procedure of the APA would create a contradiction in the statute where there need be no contradiction: the statute would provide that the repeal of a rule requires a rulemaking proceeding, but the agency could (albeit indirectly) repeal a rule simply by eliminating (or indefinitely postponing) its effective date, thereby accomplishing without rulemaking something for which the statute requires a rulemaking proceeding. By treating the indefinite postponement of the effective date as a rule for APA purposes, it is possible to avoid such an anomalous result.
 
 
 56
 In addition to the fact that the language of the statute supports our conclusion, EPA treated the proposal that the postponement be extended as a rule when on October 13, 1981, it published its notice of rulemaking on the extension: the "rule" to be decided upon was the further postponement of the effective date of the amendments. If the further postponement of the effective date was subject to rulemaking, then it follows that the initial postponement must have been similarly subject.
 
 
 57
 The issues addressed by the court in Council of the Southern Mountains v. Donovan, 653 F.2d 573 (D.C.Cir.1981) (per curiam) are similar to several of the issues raised here. That case involved regulations "requiring coal operators to equip all underground miners with self-contained self-rescuers (SCSRs).... The regulations gave coal operators two years, until December 21, 1980, to order and supply the devices." Id. at 575. On December 5, 1980, the Secretary "deferred implementation of the regulations until June 21, 1981," id.[22] Petitioners filed a challenge to that deferral, claiming that the deferral was improper because it had been accomplished without notice and comment procedures in violation of the APA. The government "did not dispute that the December 5 order was the type of agency action ordinarily subject to the notice-and-comment procedure." Id. at 580. The court agreed with the government:
 
 
 58
 Section 553(b)(A) of the APA excepts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from the notice-and-comment requirement. Intervenor asserts that the December 5 order fell within this exception since it was an "interpretative rule." The Secretary's published notice, however, did not invoke § 553(b)(A) and Government counsel told this court at oral argument that the order deferring implementation of the SCSR regulations "would most likely be considered a substantive rule" since it "did affect the rights of the parties involved." We agree with the Government that the December 5 order was a substantive rule since, by deferring the requirement that coal operators supply life-saving equipment to miners, it had " 'palpable effects' upon the regulated industry and the public in general." National Helium Corp. v. Federal Energy Administration, 569 F.2d 1137, 1146 (Em.App.1977).
 
 
 59
 653 F.2d at 580 n.28.
 
 
 60
 We agree with the court in Council of the Southern Mountains. Here, however, instead of deferring the effective date of the amendments for a definite period, EPA postponed the amendments indefinitely. This indefinite postponement could have operated as a repeal. It certainly had " ' "palpable effects" upon the regulated industry and the public in general,' " because, inter alia, the postponement of the amendments likewise postponed the obligation of the integrated electroplating industry to comply with categorical pretreatment standards, and therefore had a substantial impact upon both the public and the regulated industry.
 
 
 61
 In Consumer Energy Council of America v. FERC, 673 F.2d 425 (D.C.Cir.1982), the Consumer Energy Council of America ("CECA") challenged FERC's action in revoking a rule without complying with the notice and comment requirement of the APA. FERC had issued a final rule on May 6, 1980, which, pursuant to the provisions of the Natural Gas Policy Act of 1978, would take effect in thirty days if neither House of Congress vetoed it within that period. Two weeks after the rule was issued, the House of Representatives vetoed it. CECA then filed a petition for rehearing asking FERC to make the rule effective in spite of the veto, on the ground that the one-house veto was unconstitutional. FERC refused to reach the constitutional question, denied the petition, and revoked the May 6 rule altogether. CECA then sought review in the United States Court of Appeals for the District of Columbia Circuit. Id. at 433-34.
 
 
 62
 The threshold question confronting the District of Columbia Circuit was whether FERC's revocation of the May 6 rule rendered the case before it moot.[23] In the course of deciding that the case was not moot, the court held that FERC's revocation of the May 6 rule without complying with the APA notice and comment procedures was improper.
 
 
 63
 FERC contends that its revocation order renders this case moot because there no longer is a rule for petitioners to challenge. Petitioners ... contend that even if FERC had power to revoke the rule, the revocation order was invalid because FERC did not comply with the notice and comment requirements of the APA.... We find that FERC's revocation order is invalid because it was issued in violation of the APA....
 
 
 64
 FERC makes two arguments why it was not required to provide notice and comment prior to revoking the Phase II rule. First, it argues that the November 1979 notice and opportunity to comment provided prior to promulgation of the Phase II rule was sufficient to cover the order of revocation. FERC provides no support for this contention, but intervenors expand on it by asserting that petitioners had ample notice originally that one option to be considered by the Commission was to adopt no rule at all, and that this is all the APA requires. We disagree. Sections 553(b) and (c) set forth notice and comment requirements for "rule making," which is defined in section 551(5) to mean "agency process for formulating, amending, or repealing a rule." Thus, the APA expressly contemplates that notice and an opportunity to comment will be provided prior to agency decisions to repeal a rule. If the notice and comment provided prior to a rule's promulgation were meant to be sufficient to encompass any later repeal of the rule, simply because there was always a possibility that no rule would be adopted, the statute never would have included repeal of a rule within the definition of rulemaking.
 
 
 65
 The value of notice and comment prior to repeal of a final rule is that it ensures that an agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal. Such an opportunity was lacking here.... (Under the facts of this case), notice and comment would have been useful prior to repeal, and thus buttress further our conclusion that the Commission was required to follow section 553.
 
 
 66
 Id. at 445-446; footnotes omitted. The court in CECA v. FERC thus decided that the rule before it was final when it was published in final form, even though it would not go into effect until thirty days later, and that the act of the agency in revoking it "fit squarely within the category of actions subject to the APA's notice and comment requirements," Id. at 446 n. 74, even though the rule which FERC revoked had never gone into effect.
 
 
 67
 Because the indefinite postponement of the effective date of a final rule fits the APA definition of "rule" where, as here, the postponement has a substantial impact upon the public and upon the regulated industry, we conclude that the postponement challenged in this case was subject to the rulemaking procedure of the APA. Thus, EPA was obligated to comply with the APA's notice and comment procedure in promulgating the rule, unless EPA asserted good cause for its decision not to comply with the APA. 5 U.S.C. § 553(b)(B). We turn now to that question.
 
 Good Cause
 
 68
 "(T)he APA's exception for good cause is to be narrowly construed." Sharon Steel Corp. v. EPA, 597 F.2d 377, 379 (3d Cir. 1979); see Mobay Chemical Corp. v. Gorsuch, 682 F.2d 419, at 426 (3d Cir. 1982). In Council of the Southern Mountains, the court stated:
 
 
 69
 (C)ircumstances justifying reliance on (the good cause) exception are "indeed rare" and will be accepted only after the court has "examine(d) closely proffered rationales justifying the elimination of public procedures." (Citation omitted.)
 
 
 70
 We proceed, therefore, to "examine closely" both the circumstances surrounding the December 5 (deferral) order and the Secretary's stated rationale for failing to follow notice-and-comment procedures before issuing that order.
 
 
 71
 653 F.2d at 580.
 
 
 72
 In Consumer Energy Council of America v. FERC, 673 F.2d 425 (D.C.Cir.1982), FERC argued that, even if the APA applied to the revocation of the rule, FERC had asserted "good cause" for failure to comply with APA by stating that notice and comment were "unnecessary," and later adding that its action was justified because the regulations had been defectively promulgated. The court ruled that FERC's asserted justifications did not constitute "good cause":
 
 
 73
 (T)he argument that repeal was required because the regulations were defective does not explain why notice and comment could not be provided. This court has held that "use of these exceptions by administrative agencies should be limited to emergency situations." The fact that FERC considered these regulations defective did not imply that an emergency existed.... Since no emergency existed, the Commission was not entitled to ignore section 553(b).
 
 Id. at 448. The court pointed out that:
 
 74
 The Commission's argument that notice and comment requirements do not apply to "defectively promulgated regulations" is untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation. Such a holding would ignore the fact that the question whether the regulations are indeed defective is one worthy of notice and an opportunity to comment.
 
 
 75
 Id. at 447 n. 79.
 
 
 76
 We turn now to the circumstances surrounding the indefinite postponement of the amendments in this case. In the statement in which it indefinitely postponed the effective date of the amendments, EPA stated only that its action was being taken pursuant to E.O. 12291. E.O. 12291 says nothing about the notice and comment requirements of the APA, and does not attempt to authorize an agency to act without complying with those requirements. Rather, E.O. 12291 specifically states that any action taken pursuant to it must be in compliance with applicable law.[24]
 
 
 77
 There could be no reason for failing to comply with the APA under the circumstances of this case other than the approach of the March 30 effective date of the amendments and a desire by EPA to write an RIA pursuant to E.O. 12291 before the effective date of the amendments. However, the imminence of a deadline or the "urgent need for action" is not sufficient to constitute "good cause" within the meaning of the APA, where it would have been possible to comply with both the APA and with the statutory deadline. Mobay Chemical Corp. v. Gorsuch, 682 F.2d 419, at 426 (3d Cir. 1982); Philadelphia Citizens in Action v. Schweiker, 669 F.2d 877, 883 (3d Cir. 1982); Sharon Steel Corp. v. EPA, 597 F.2d at 379-380; American Iron and Steel Institute v. EPA, 568 F.2d 284, 292 (3d Cir. 1977).[25]
 
 
 78
 EPA in this case could have complied with both the APA and E.O. 12291.[26] This conclusion is supported by the EPA's action on October 13, 1981. On that date, EPA published a "final rule" terminating the indefinite postponement, 46 Fed.Reg. 50502, and a "proposed rule" proposing a further postponement, 46 Fed.Reg. 50503. EPA thus published the final rule terminating the postponement before the RIA required by E.O. 12291 had been prepared:
 
 
 79
 On January 28, 1981, the Environmental Protection Agency promulgated amendments to the General Pretreatment Regulations for Existing and New Sources (46 FR 9404-9460). On March 27, 1981, the effective date of these amendments was indefinitely postponed, in order to enable the Agency to conduct a Regulatory Impact Analysis under Executive Order 12291 (46 FR 19926, April 2, 1981).
 
 
 80
 EPA has decided to terminate the indefinite postponement of the general pretreatment amendments and make them effective January 31, 1982. This is being done to allow public comment on the question of whether the amendments should be postponed indefinitely and in response to various groups' suggestions that portions of the general pretreatment amendments be put immediately into effect. By separate notice published this day, EPA is initiating a rulemaking on whether the amendments should be further postponed.
 
 
 81
 Under Executive Order 12291, EPA must judge whether a regulation is "major" and therefore subject to the requirement of a Regulatory Impact Analysis. EPA is presently conducting a Regulatory Impact Analysis on the amendments to the general pretreatment regulations. Consequently, this rule, which puts those amendments into effect, may possibly be considered major. For the reasons previously outlined in this notice, EPA has nevertheless concluded that the amendments to the general pretreatment regulations should go into effect while they are under reconsideration.
 
 
 82
 46 Fed.Reg. 50502 (October 13, 1981) (emphasis added). Thus, EPA decided to terminate the postponement of all of the amendments prior to the preparation of an RIA, and to allow the amendments to go into effect without such prior preparation. On the same day as it terminated the postponement of the effective date of all the amendments, EPA gave notice of and established a comment period for a proposed rule which would indefinitely postpone the effective date of the amendments, stating that "EPA has not as yet conducted a rulemaking on the desirability and appropriate scope of the deferral." 46 Fed.Reg. 50503 (October 13, 1981). We see no reason, and none has been supplied, why EPA could not have followed this course of action at the time of the initial postponement, instead of waiting until October 13, 1981, to do so.
 
 
 83
 Moreover, on January 31, 1982, all except four of the amendments went into effect, and EPA explicitly stated that allowing all except four of the amendments to go into effect without prior preparation of an RIA was consistent with the obligations imposed upon it by E.O. 12291. 47 Fed.Reg. 4520 (February 1, 1982) (quoted supra). EPA also indicated that the RIA could be prepared while the amendments were in effect. Id.
 
 
 84
 If holding a rulemaking on the question of postponement and terminating the postponement of all of the amendments (including the four at issue here) was consistent with E.O. 12291 on October 13, 1981, and if allowing all except four of the amendments to go into effect was consistent with E.O. 12291 on January 31, 1982, then compliance with the APA would also have been consistent with E.O. 12291 on March 27, 1981, the date EPA signed the order postponing the effective date of the amendments.[27]
 
 
 85
 Finally, EPA's reasons for allowing all except four of the amendments to go into effect on January 31, 1982, quoted in Part I supra, highlight the need for notice and comment procedures in connection with actions such as EPA's indefinite postponement of the effective date of the regulations. The notice and comment proceeding held pursuant to the October notice of rulemaking demonstrated to EPA that "the regulated community and the public would be best served by the improved provisions of the 1981 amendments." 47 Fed.Reg. 4520 (February 1, 1982). In other words, the amendments drafted by EPA improved the regulations. Had EPA complied with the APA in connection with the initial postponement, EPA might have made this discovery earlier than it did, and the public and the regulated community would have been able to benefit from the amendments all the sooner. See Mobay Chemical Corp. v. Gorsuch, 682 F.2d 419, at 426 (3d Cir. 1982) ("EPA's difficult task would have been facilitated had it scrupulously observed the notice-and-comment procedure"); Texaco, Inc. v. FPC, 412 F.2d 740, 744 (3d Cir. 1969) ("Section 553 ... enables the agency promulgating the rule to educate itself before establishing rules and procedures....").
 
 
 86
 EPA supplied only one reason for its initial postponement of the amendments: E.O. 12291. However, as its later action demonstrates, it was possible to comply with both the APA and with E.O. 12291. Thus, E.O. 12291 does not constitute good cause for EPA's failure to comply with the APA when it initially postponed the effective date of the amendments.
 
 The Remedy
 
 87
 We have ruled that the indefinite postponement of the effective date of the amendments required notice and comment procedures prior to becoming effective, and that EPA did not have good cause for dispensing with the APA's requirements. The final question we must face is the remedy.
 
 
 88
 We begin with the proposition that a "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... without observance of procedure required by law." 5 U.S.C. § 706(2)(D). See Mobay Chemical Corp. v. Gorsuch, 682 F.2d 419, at 427 (3d Cir. 1982) (regulations invalidated because not promulgated in accordance with APA); Brown Express, Inc. v. United States, 607 F.2d 695, 703 (5th Cir. 1979) (court vacated rule which should have been, but was not, promulgated in accordance with the APA); American Iron and Steel Institute v. EPA, 568 F.2d at 292 (inadequacy of notice under APA requires invalidation of "interim final regulations"); cf. Arlington Oil Mills, Inc. v. Knebel, 543 F.2d 1092, 1098-99 (5th Cir. 1976) (revocation of peanut differential invalid for failure to comply with APA).
 
 
 89
 In Sharon Steel, this court stated that "basic fairness requires that (petitioners) be restored, as nearly as possible, to the position they would have occupied if the Administrator had afforded them their rights to prior notice and an opportunity for comment." 597 F.2d at 381. In this case, placing petitioner in the position it would have occupied had the APA been obeyed requires that this court order EPA to reinstate all of the amendments, effective March 30, 1981, and rule that the further postponement of the four amendments as of January 31, 1982, was ineffective.
 
 
 90
 EPA and the intervenors contend that NRDC is not entitled to a remedy, because notice and comment procedures were held in connection with the proposed rule to continue the postponement of four of the amendments, and those procedures cured any defect in the initial postponement. We cannot agree.
 
 
 91
 In Sharon Steel, 597 F.2d at 381, we stated:
 
 
 92
 We hold that the period for comments after promulgation cannot substitute for the prior notice and comment required by the APA. If a period for comments after issuance of a rule could cure a violation of the APA's requirements, an agency could negate at will the Congressional decision that notice and an opportunity for comment must precede promulgation. Provision of prior notice and comment allows effective participation in the rulemaking process while the decisionmaker is still receptive to information and argument. After the final rule is issued, the petitioner must come hat-in-hand and run the risk that the decisionmaker is likely to resist change. (Citations omitted.)
 
 
 93
 In addition, see Mobay Chemical Corp. v. Gorsuch, 682 F.2d 419, at 426 (3d Cir. 1982); Wagner Electric Corp. v. Volpe, 466 F.2d 1013, 1020 (3d Cir. 1972). Thus, the provision of post-promulgation notice and comment procedures cannot cure the failure to provide such procedures prior to the promulgation of the rule at issue. In this case, the fact that EPA provided notice and comment procedures after the postponement does not cure the failure to provide them before the postponement.
 
 
 94
 An additional argument in support of EPA is, however, that the notice and comment procedures provided after the initial postponement can replace notice and comment procedures before the initial postponement under the facts of this case. This is because notice and comment were provided in connection with the proposal that the amendments be further postponed, and NRDC was able to make all of the arguments in connection with the further postponement that NRDC would have made in connection with the initial postponement.
 
 
 95
 We cannot accept this argument. The amendments should have gone into effect on March 30, 1981, because the action of EPA in postponing them was invalid for failure to comply with the APA. Commendably, EPA did conduct a rulemaking on the question of whether its already accomplished postponement should be continued; however, that rulemaking cannot replace one on the question of whether the amendments should be postponed in the first place. Further, if the amendments had gone into effect, as they should have, on March 30, 1981, the question to be decided in the rulemaking would have been whether the amendments, which had been in effect for some time, should be suspended, and not whether they should be further postponed. The rulemaking on the further postponement could not serve as the procedural mechanism for the suspension of the four amendments.
 
 
 96
 To allow the APA procedures in connection with the further postponement to substitute for APA procedures in connection with an initial postponement would allow EPA to substitute post-promulgation notice and comment procedures for pre-promulgation notice and comment procedures at any time by taking an action without complying with the APA, and then establishing a notice and comment procedure on the question of whether that action should be continued. This would allow agencies to circumvent Sharon Steel and the APA. We cannot countenance such a result.[28]
 
 
 97
 Thus, placing the parties in the positions they would have been in if the APA had not been violated leads us to conclude that all of the amendments went into effect on March 30, 1981, and that EPA's postponement of the four amendments as of January 31, 1981 was likewise invalid. Our decision does not, of course, forestall future agency action with regard to the four amendments, provided such action is taken in compliance with the Administrative Procedure Act.
 
 
 98
 For the foregoing reasons, we grant NRDC's petition for review and remand this case to the EPA with instructions to reinstate all of the amendments, effective March 30, 1981.
 
 
 
 *
 Honorable Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 The intervenors, the Chemical Manufacturers' Association and Ford Motor Company, support EPA's position and assert arguments in addition to those asserted by EPA
 
 
 [2]
 NRDC has moved to supplement the record with six letters. EPA agrees that two of the letters, both dated March 13, 1981, should be included in the record. Thus, we grant NRDC's motion as to those two letters. A dispute remains, however, as to whether the record on appeal should include the remaining four letters, one dated January 28, 1981, one dated March 17, 1981 and two dated March 19, 1981
 In reviewing an agency's action, the reviewing court must examine the record that was before the agency when the agency took the challenged action. American Iron and Steel Institute v. EPA, 568 F.2d 284 at 296-97 (3rd Cir.). In this case, the letters do not indicate on their face and there has been no showing that they were considered by (or in the possession of) EPA when it decided to postpone the amendments indefinitely. Pursuant to a Freedom of Information Act request, EPA sent NRDC a list of documents which were before it when it made its decision; the four letters at issue in NRDC's motion were not included on the list. Although the letters reflect industry efforts to have the officials to whom the letters were addressed place industry views before EPA, they do not indicate that those views were in fact transmitted.
 For the foregoing reasons, NRDC's motion to supplement the record with the four letters is hereby denied, and EPA's motion to strike those portions of NRDC's brief which refer to those letters is granted.
 
 
 [3]
 33 U.S.C. § 1369(b)(1) provides, in part:
 "Review of the Administrator's action ... (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title ... may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person."
 
 
 [4]
 Treatment works are "systems used in the storage, treatment, recycling, and reclamation of municipal sewage or industrial wastes of a liquid nature...." 33 U.S.C. § 1292(2)(A). The definition of POTWs includes "any other method or system for preventing, abating, reducing, storing, treating, separating, or disposing of municipal waste, including storm water runoff, or industrial waste...." 33 U.S.C. § 1292(2)(B)
 
 
 [5]
 That portion of § 1317(b)(1) which allows the discharge of pollutants into POTWs to the extent that the POTWs are capable of removing the pollutants was added in 1977
 
 
 [6]
 See NRDC v. Costle, 12 ERC 1833 (D.D.C.1979); NRDC v. Train, 8 ERC 2120 (D.D.C.1976)
 
 
 [7]
 The amendments "reflected the agreements" between EPA and several industry petitioners, including the Chemical Manufacturer's Association, which had raised a court challenge to various aspects of the 1978 regulations. 46 Fed.Reg. 9404 (January 28, 1981)
 Only the amendments proposed October 29, 1979 are at issue here; the 1978 regulations are unaffected by this suit.
 
 
 [8]
 No procedural defect has been alleged here in connection with the notice and comment period which extended from October 29, 1979 until January 29, 1981
 
 
 [9]
 A "major rule" is defined in Section 1(b) of E.O. 12291 as a regulation likely to affect the economy by $100 million or more a year, cause a major increase in costs or prices, or have a significant adverse impact on competition, employment, investment, productivity, innovation, or on the capacity of United States industry to compete with foreign industry. The power to decide whether a rule was a major rule was given to each agency as to its own regulations. E.O. 12291 § 3(b)
 
 
 [10]
 Ford points out that the CWF as promulgated in final form was different from the originally proposed CWF. However, Ford does not argue here that the CWF is procedurally invalid for this reason
 
 
 [11]
 There are two types of pretreatment regulations promulgated pursuant to 33 U.S.C. § 1317(b)(1): general pretreatment regulations and categorical pretreatment regulations. Categorical pretreatment regulations are those tailored to fit the characteristics of a particular industry
 
 
 [12]
 The underlined portion apparently was added to the regulation after Ford challenged the categorical electroplating regulations. See 46 Fed.Reg. 9405 (January 28, 1981)
 An "integrated facility" is a facility that performs electroplating as only one of several operations necessary for manufacture of a product at a single physical location and has significant quantities of process wastewater from non-electroplating manufacturing operations. In addition, to qualify as an "integrated facility" one or more plant electroplating process wastewater lines must be combined prior to or at the point of treatment (or proposed treatment) with one or more plant sewers carrying process wastewater from non-electroplating manufacturing operations.
 
 
 [40]
 C.F.R. § 413.02(h)
 
 
 [13]
 Various challenges have apparently been filed to the substance of the amendments. The sole issue here, however, is the validity under the APA of the indefinite postponement of the effective date of the amendments. We express no view on the substance of the amendments
 EPA did not rely on 5 U.S.C. § 705, which allows for postponement pending judicial review, as authority for the postponement of the effective date of the amendments.
 
 
 [14]
 In the notice, EPA stated that the establishment of a new effective date for the amendments "may possibly be considered (a) major (rule, as defined in E.O. 12291)."
 
 
 [15]
 This case may well be moot as to all of the amendments except the four which were further postponed: all of the amendments except those four are now in effect, and none of the amendments now in effect had a specific compliance date or triggered further compliance obligations by becoming effective. However, the case is not moot as to the four amendments which remain postponed. Separating out the four amendments and dismissing this case as moot in part would be pointless, however, because the analysis set forth infra would not be affected by such an action
 
 
 [16]
 Ford's argument requires the assumption that rules are not final until after they have become effective, i.e., until their effective date has passed. If Ford's assumption were correct, it would mean that an agency, without complying with the APA, could alter its regulations in any way at any time after their publication in final form and prior to their effective date. This would vitiate both pre-effective date judicial review and pre-effective date publication
 E.O. 12291, Section 7, refers to rules which are final but not yet effective. If Ford's position were correct, there could be no final rule not yet in effect, because a rule would only become final when it went into effect.
 
 
 [17]
 The court also noted that "(t)he Commission's action in revoking the final rule ... fit squarely within the category of actions subject to the APA's notice and comment requirements." Id
 
 
 [18]
 Commonwealth of Pennsylvania Department of Environmental Resources v. EPA, 618 F.2d 991 (3d Cir. 1980), relied on by Ford, is readily distinguishable. In that case, the challenge was to regulations which "specifically defer(red) promulgation of regulations." Id. at 993. The court construed the challenge as one to "omissions from regulations or failure to promulgate regulations," id. at 994, and noted that it was "confronted with a petitioner's request that the EPA be ordered to promulgate new or different regulations." Id. at 996; footnote omitted. In this case, NRDC challenges an indefinite postponement of promulgated and final regulations; NRDC does not seek the promulgation of new or different regulations
 
 
 [19]
 In drafting the amendments, presumably EPA considered the time deadlines set forth in the Clean Water Act. See 33 U.S.C. § 1251(a). As EPA itself stated in promulgating the amendments in final form:
 The Clean Water Act was meant to "restore and maintain the chemical, physical, and biological integrity of the Nation's Waters" by establishing as a national goal the elimination of the discharge of pollutants into the navigable waters by 1985.
 
 
 [46]
 Fed.Reg. 9411 (January 28, 1981)
 
 
 [20]
 As was discussed in Part II(A) supra, Ford contends that the amendments were postponed on March 27, before their effective date, when EPA signed the order postponing them. NRDC contends that the amendments were postponed on April 2, after their effective date, when the postponement was published in the Federal Register. We decided supra that rules may be final before their effective date. This argument presents the question of when an administrative action is effective: the date of the action or the date of its publication. We do not reach this question. As the discussion below will demonstrate, the answer to this question is irrelevant for purposes of the analysis here
 
 
 [21]
 The APA defines a "rule" and "rulemaking" as follows, 5 U.S.C. § 551(4)-(5):
 (4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services, or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;
 (5) "rule making" means agency process for formulating, amending, or repealing a rule.
 That the amendments are "rules" within the meaning of the APA is uncontested.
 The APA sets forth the required contents of a rulemaking proceeding at 5 U.S.C. § 553(b)-(e):
 (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include-
 (1) a statement of the time, place, and nature of public rule making proceedings;
 (2) reference to the legal authority under which the rule is proposed; and
 (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
 Except when notice or hearing is required by statute, this subsection does not apply-
 (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice;
 (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.
 (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose....
 (d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except-
 (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
 (2) interpretative rules and statements of policy; or
 (3) as otherwise provided by the agency for good cause found and published with the rule.
 (e) Each agency shall give an interested person the right to petition for the issuance, amendment or repeal of a rule.
 
 
 [22]
 The case thus involved a change in the date by which the operators had to comply with the regulation. However, that does not make the reasoning of the court in that case inapplicable here
 
 
 [23]
 It is true that in CECA FERC revoked the rule, while in this case EPA postponed the amendments indefinitely. However, an indefinite postponement which is never terminated is tantamount to a revocation. We must look at the character of the action taken at the time it is taken in order to determine whether the APA applies. At the time EPA acted, its postponement could have constituted a repeal. Indeed, four of the amendments have not yet gone into effect. To allow the indefinite postponement of a rule without compliance with the APA, when a repeal would require such compliance, would allow an agency to do indirectly what it cannot do directly
 
 
 [24]
 In Sharon Steel, EPA argued that an approaching deadline set by the Clean Air Act excused its failure to comply with the APA. We rejected that argument, noting in the course of our analysis that "(i)n enacting amendments to the Clean Air Act, Congress gave no explicit indication that it intended to override the procedural safeguards of the APA." 597 F.2d at 380. Similarly, in E.O. 12291 the President gave no "explicit indication" that he intended to ask the agencies not to comply with the APA. Indeed, he specifically stated that agencies should comply with all applicable law
 
 
 [25]
 In Council of the Southern Mountains, the court stressed the need for exceptional circumstances before the imminence of a deadline will constitute good cause for a failure to comply with the APA:
 The Secretary's justification for dispensing with notice and an opportunity to comment was "the imminence of the deadline" for implementing the SCSR regulations. This rationale is one that permits avoidance of APA procedures only in exceptional circumstances. Otherwise, an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the "good cause" banner and promulgate rules without following APA procedures. Because of the possibility for abuse, "the mere existence of deadlines for agency action .... (can) not in itself constitute good cause for a § 553(b)(B) exception." (Citation omitted.)
 653 F.2d at 580-81.
 
 
 [26]
 In State of New Jersey, Department of Environmental Protection v. EPA, 626 F.2d 1038 (D.C.Cir.1980), the court followed Sharon Steel and ruled that the demands of the Clean Air Act and of the APA were not irreconcilable and that the approach of a Clean Air Act deadline did not exempt the agency from the requirements of the APA. The court continued:
 Our third, and basic, consideration is that, whatever one's conclusions about the general compatibility of the APA and the Clean Air Act, the Third and Fifth Circuits have demonstrated that, under the facts of this case, the Administrator could have reconciled the commands of the two acts by publishing the designations submitted to him by the states as proposed rules. See Sharon Steel, 597 F.2d at 380 ...
 626 F.2d at 1047 (emphasis added). Thus, our "good cause" analysis will end if we decide that, under the particular circumstances of this case, EPA could have complied both with the APA and with E.O. 12291: if it was possible to comply with both, the approaching effective date cannot constitute good cause for failure to comply with the APA.
 We do not reach the question here of whether a deadline imposed by an Executive Order is entitled to the same deference as a deadline created by statute. See Philadelphia Citizens in Action v. Schweiker, 669 F.2d at 886 (stressing fact that Congress established deadline). We decide only that, assuming an Executive Order deadline is entitled to the same deference as a statutory deadline, obeying the APA in this case was consistent with E.O. 12291. Thus, we need not reach the question which would be presented if it were impossible to comply with both.
 
 
 [27]
 The reasons supplied by EPA for the further postponement of the four amendments, see 47 Fed.Reg. 4520 (February 1, 1982), refer to no changed circumstances. E.O. 12291 was not cited as a reason for the further postponement of the four amendments, and EPA did not state that allowing the four amendments to go into effect would have been inconsistent with E.O. 12291
 
 
 [28]
 Before a rule is promulgated in final form, there is a need for flexibility in assigning an effective date in order to give the agency involved an adequate opportunity to evaluate comments and to formulate a final rule. See, e.g., Sierra Club v. Costle, 657 F.2d 298, 315-16 (D.C.Cir.1981) (substantial delay between close of comment period and promulgation of final rule not impermissible). We do not question the authority of an agency to set a deadline for the submission of comments, or the authority of an agency to propose a rule, and, after notice and comment, decide not to promulgate any final rule. See, e.g., WWHT, Inc. v. FCC, 656 F.2d 807 (D.C.Cir.1981). Nor do we question the right of parties to petition for reconsideration of a rule during the thirty-day hiatus period required by the APA or at any other time: this case does not present a situation where such a petition was filed and the agency, without holding a notice and comment period, postponed the effective date of the challenged rule in order to consider the petition. Finally, we do not question in this case the authority of an agency to establish an effective date commensurate with the statute involved