618 F.2d 991
 14 ERC 1449, 14 ERC 1545, 57 A.L.R.Fed. 837,
10 Envtl. L. Rep. 20,152
 COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF ENVIRONMENTAL
RESOURCES, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
National Coal Association, Intervenor.
PENNSYLVANIA CITIZENS COALITION and Environmental Law
Council of University of Pittsburgh School of Law,
Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 Nos. 79-1057, 79-1466.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 15, 1979.
Decided Feb. 12, 1980.
Opinion on Rehearing March 28, 1980.
 
 K. W. James Rochow (argued), Gary Waxman, Asst. Attys. Gen., Philadelphia, Pa., for petitioner Commonwealth of Pennsylvania, Dept. of Environmental Resources.
 Patrick Charles McGinley (argued), Morgantown, W. Va., for Environmental Group petitioners.
 George C. Freeman, Jr., Michael B. Barr (argued), Scott Slaughter, Hunton & Williams, Washington, D. C., for intervenor-respondent National Coal Ass'n; Robert F. Stauffer, Gen. Counsel, National Coal Ass'n, Washington, D. C., of counsel.
 Sanford Sagalkin, Acting Asst. Atty. Gen., Angus Macbeth, Bingham Kennedy, Attys., Dept. of Justice, Washington, D. C., for respondent Environmental Protection Agency; Joan Z. Bernstein, Gen. Counsel, Steven Schatzow, Deputy Associate Gen. Counsel, Barry S. Neuman, Atty. (argued), E. P. A., Washington, D. C., of counsel.
 Before GIBBONS, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 These consolidated cases are petitions to review regulations, promulgated by the Administrator of the Environmental Protection Agency, which establish standards of performance for new point sources in the coal mining industry. Petitioner in No. 79-1057 is the Department of Environmental Resources of the Commonwealth of Pennsylvania. Petitioners in No. 79-1466 are the Pennsylvania Citizens Coalition and the Environmental Law Council of the University of Pittsburgh School of Law.[1] Intervenor-Respondent National Coal Association is a trade association whose members own or operate more than 50 percent of the nation's commercial coal producing capacity, which includes numerous mines and mine-related facilities in Pennsylvania. The Respondent in these consolidated appeals is the United States Environmental Protection Agency (EPA). We dismiss for lack of jurisdiction.
 
 I. PROCEEDINGS BEFORE EPA
 
 2
 Petitioners seek review, pursuant to section 509 of the Federal Water Pollution Control Act, 33 U.S.C. § 1369 (1976 & Supp. I), of certain regulations promulgated by the Administrator of the EPA under section 306 of the Act, id. § 1316. Section 306 requires that the Administrator publish a list of source categories, including, at a minimum, the twenty-seven categories listed in the Act. See id. § 1316(b)(1)(A). Following inclusion of any new category on the list, the section requires that, within specified time limits, the Administrator promulgate standards of performance for new point sources in the category. Id. § 1316(b)(1)(B). The section defines "new source" as
 
 
 3
 any source, the construction of which is commenced after the publication of proposed regulations prescribing a standard of performance under this section which will be applicable to such source, if such standard is thereafter promulgated in accordance with this section.
 
 
 4
 Id. § 1316(a)(2). The same section also defines a "standard of performance" as
 
 
 5
 a standard for the control of the discharge of pollutants which reflects the greatest degree of effluent reduction which the Administrator determines to be achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants.
 
 
 6
 Id. § 1316(a)(1). Section 1362, the general definition section of the Act, defines "point source" to mean
 
 
 7
 any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture.
 
 
 8
 Id. § 1362(14).
 
 
 9
 In the instant case, the Administrator, acting pursuant to section 306, added coal mining as a new source category. See 40 Fed.Reg. 48,712-13 (1975). He thereafter promulgated the contested regulations. 44 Fed.Reg. 2586, 2590 (1979). These regulations specifically defer promulgation of regulations that will apply to those water polluting discharges attributable to closed or abandoned mines, which are known as post-mining discharges and which technically qualify as new point sources under the Act.[2] Petitioners contend that the Administrator lacked the authority to defer promulgation of new source performance standards applicable to these post-mining discharges.
 
 II. JURISDICTION
 
 10
 Petitioners and EPA both urge that this court has jurisdiction to consider the merits of the petition. Respondent National Coal Association, on the other hand, contends that the case belongs in a district court.
 
 
 11
 Judicial review under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1376 (1976 & Supp. I), is split between the district court and the court of appeals. Compare 33 U.S.C. § 1365 (section 505 citizens' suits provision; district court has jurisdiction) with id. § 1369(b) (section 509 review of Administrator's actions; court of appeals has jurisdiction).
 
 
 12
 Petitioners sought review in this court pursuant to section 509(b) of the Act. Id. § 1369(b). The section provides in relevant part that
 
 
 13
 (r)eview of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title (section 306 of the act) . . . may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person.
 
 
 14
 Id. § 1369(b)(1). Petitioners contend that the Administrator's regulations were deficient under section 306 as promulgated and thus are within the terms of 509(b)(1)(A), 33 U.S.C. § 1369(b)(1)(A).
 
 
 15
 The National Coal Association argues that the suit in essence challenges the failure of the Administrator to act with respect to post-mining discharges and thus jurisdiction is governed by the citizens' suit provision of the Act. Id. § 1365. That section provides that a citizen, as defined in the Act, see id. § 1365(g), may commence a civil action on his own behalf in two general types of cases, including a civil action
 
 
 16
 against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.
 
 
 17
 Id. § 1365(a)(2).
 
 
 18
 Unlike many other statutes providing for judicial review of agency action in the court of appeals, section 509 is not in terms limited to final agency action. Thus arguably EPA action postponing a decision can be reviewed here.[3] Thus the resolution of this jurisdictional dispute ultimately depends upon whether section 509 review was intended by Congress to encompass omissions from regulations or failure to promulgate regulations under section 306 or whether such failures and omissions were intended to be included as nondiscretionary duties of the Administrator reviewable under section 505. Unfortunately the legislative history of the two provisions is not illuminating.[4] Nor does the legislative history of section 306 provide any clue to congressional intent with regard to the split review scheme.[5]
 
 
 19
 We conclude that these cases are suits seeking to have this court compel the Administrator to perform a nondiscretionary duty and, as such, they should have been brought in federal district court pursuant to section 505 of the Act. Thus, we adopt the analysis of the Act's jurisdictional scheme adopted by the District of Columbia Circuit in a similar factual setting. See Environmental Defense Fund v. EPA (EDF), 194 U.S.App.D.C. 143, 171-172, 598 F.2d 62, 90-91 (D.C. Cir. 1978). EDF challenged the EPA's failure to include past manufacturers and users of polychlorinated biphenyls in its polychlorinated biphenyl regulations. EDF petitioned the court of appeals for review of this omission from the regulations as promulgated.[6] That court held, however, that because EDF sought court-compelled additional rulemaking by EPA, "(j) urisdiction over EDF's claim lies only in the district court," id. at 172, 598 F.2d at 91, which would have jurisdiction over a suit alleging failure of the Administrator to act whether the act was allegedly mandatory[7] or discretionary.[8] Petitioners contend that EDF is distinguishable because in that case there had been no discussion of extending the regulation to past manufacturers and users in the rulemaking proceedings, whereas the issue of post-mining discharges was raised in the instant proceedings and regulation thereof was merely deferred. However, deferral is no more nor less a failure to act than the failure to regulate encountered in EDF. In each case, jurisdiction lies in the district court, not in the court of appeals. Petitioners' attempted distinction ultimately relies upon the argument that review should normally lie in this court. Thus, section 509, they argue, should be read as a limitation on the district court's section 505 jurisdiction. In their view, as long as the subject matter of the deferred regulations was included in the scope of the administrative proceedings, there is a sufficient record for this court to review. In support of this contention, they call our attention to cases in which certain failures of the Administrator have been reviewed under section 509.[9] In those cases, however, the courts of appeals were called upon to review the substance or effect of promulgated regulations; the courts were not confronted with a petitioner's request that the EPA be ordered to promulgate new or different regulations.[10] Although petitioners correctly point out that each such case involved some shortcoming of each set of regulations, an allegation of inadequacy of a set of regulations is quite different from an allegation that a needed regulation was nonexistent. The former case is included within our authority to review under section 509; the latter, however, must be reviewed under section 505. Although there would be section 509 jurisdiction over a decision of the Administrator to deny a permit application, in the present matter there was no such denial. Our holding does not conflict with the decisions of this court in American Iron & Steel Institute v. EPA (AISI I), 526 F.2d 1027 (3d Cir. 1975) or American Iron & Steel Institute v. EPA (AISI II), 568 F.2d 284 (3d Cir. 1977).[11] In AISI I, this court addressed, inter alia, two alleged inadequacies of regulations promulgated under the Federal Water Pollution Control Act. First, we reviewed a regulation promulgated pursuant to section 304 of the Act, which requires the EPA to establish certain guidelines.[12] We remanded the matter to EPA for repromulgation, holding that a single number ceiling on permissible effluent discharges was not a guideline and thus that the promulgation was invalid. American Iron & Steel Inst. v. EPA, 526 F.2d at 1046. Second, we rejected on the merits petitioners' argument that the Administrator had failed to use an adequate data base in promulgating limitations under section 306. Id. at 1057. The AISI I petitioners did not, however, allege that the Administrator failed to act at all, but rather that his promulgations were deficient. Id. at 1042-46, 1057. Thus, this court properly reviewed those contentions under our section 509 jurisdiction. In the instant case, however, the petitioners do not challenge the regulations which were issued, but seek to have us compel further promulgations with respect to post-mining discharges. Our conclusion that such a contention may only be raised in a section 505(a)(2) proceeding in district court, 33 U.S.C. § 1365(a)(2) (suits against Administrator for failure to perform nondiscretionary duty), therefore does not conflict with AISI I. Nor does it conflict with the subsequent American Iron & Steel Institute (AISI II) decision. As a part of its review of the regulations promulgated in that case, the court reviewed the Administrator's decision to exempt certain of petitioners' competitors from the section 301 limitations. Section 301(e) requires that all point sources be included within the limitations. 568 F.2d at 307; see 33 U.S.C. § 1311(e). Thus, this court could, within its section 509 jurisdiction, review the exemption of those competitors from the section 301 limitations. See 33 U.S.C. § 1369(b)(1)(E). The AISI II petitioners did not allege that the Administrator failed to promulgate at all but contended that his regulations improperly excluded a group of competitors to which they should have been extended. Their objection was to the imposition of the promulgated regulation on them, while their competitors remained exempt. 568 F.2d at 307-08.
 
 
 20
 We are here asked not to suspend regulations, but to order the promulgation of completely new and different regulations. We hold, therefore, that petitioners are required to seek the relief they ask for from the district court. Moreover, to the extent that our holding is inconsistent with the Fourth Circuit's decision in Consolidation Coal Co. v. Costle, 604 F.2d 239 (4th Cir. 1979), we decline to follow it.
 
 
 21
 Conceding that section 505 and section 509 read alone or in conjunction with each other remain opaque, we find pragmatic reasons supporting the interrelationship between them that relegates suits to compel agency promulgation of regulations to the district court. First, the citizens' suit provision is subject to a requirement that the plaintiff give the EPA sixty days' notice before a court may order the performance of a mandatory duty. 33 U.S.C. § 1365(b). Because of the Act's definition of citizens permitted to sue for relief under section 505, we are faced with the possibility that these same individuals might seek section 509 relief, thus circumventing the required waiting period. Compare id. § 1365(g) (defining citizen for purpose of § 505 citizens' suit as a person "having an interest which is or may be adversely affected") with id. § 1369 (§ 509 review of certain acts "may be had by any interested person"). If we construe our section 509 jurisdiction as encompassing petitions demanding the same type of relief as is available under section 505, the agency may lose the protection of the waiting period, which does not apply to a section 509 petition for review. Second, although section 509 is not couched in "final order" terms, an interpretation of the language "action (A) in promulgating any standard" to include action postponing promulgation of a standard would open this court to unlimited interlocutory review of all sorts of procedural steps taken in EPA rulemaking proceedings. While the absence of any finality language in section 509 points to the availability of such review, it does so only slightly. By stressing the word "promulgation" rather than the word "action" one can find in section 509 the equivalent of a finality requirement. Since unlimited interlocutory review could seriously impede the performance of the EPA's rulemaking functions, there are strong policy reasons for that reading. Moreover interested parties aggrieved by EPA inaction are not left entirely without remedies. They can resort to district court relief under section 505.
 
 
 22
 Excluding from our section 509 jurisdiction petitions, however artfully couched, which seek no more than to force EPA to promulgate point source standards does no violence to the review scheme of the Federal Water Pollution Control Act. As our holdings in AISI I and AISI II illustrate, the exclusion of a competitor from coverage may afford a reason for seeking to prevent the operation of a standard until the competitor is included. But where the only real relief sought is to compel the adoption of an additional standard, the citizens' suit provisions in section 505 suffice.
 
 III. CONCLUSION
 
 23
 The petitions for review will be denied.
 
 
 24
 Submitted Pursuant to Rule 12(6) on Rehearing
 
 
 25
 March 7, 1980.
 
 
 26
 Before GIBBONS, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 
 OPINION ON REHEARING
 
 27
 GIBBONS, Circuit Judge.
 
 
 28
 The petitioner and the respondent in this action seeking review of an order of the Environmental Protection Agency (EPA) have jointly petitioned for rehearing by the original panel. The petition for review was consolidated with No. 79-1057. Both in No. 79-1057 and in No. 79-1466 the petitioners sought to challenge the decision of the Administrator of EPA to defer promulgation of new source performance standards, under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1376 (1976 & Supp. I), for water polluting discharges attributable to closed or abandoned mines. In the opinion filed February 12, 1980, we held that this court lacked jurisdiction to consider that contention in a petition for review filed pursuant to section 509 of the Federal Water Pollution Control Act, 33 U.S.C. § 1369(b). Suits seeking to cure EPA inaction, we held, should be brought in the district courts under section 505 of the Act. 33 U.S.C. § 1365. Therefore we denied the petitions for review. The petitioner and the respondent have called to our attention the fact that in No. 79-1466 petitioners also challenged the definition of "new source" coal mines contained in the regulations as promulgated. This challenge, they contend, properly lies here pursuant to section 509, because unlike the dispute over postponement of the decision on standards for discharges attributable to closed or abandoned mines, the second issue raised in No. 79-1466 involved an actually promulgated regulation having the effect of exempting some operating mines while affecting others. Our previous opinion treated this issue as the equivalent of a challenge to EPA inaction. Although the question is a close one we are now convinced, however, that the challenge to the definition of "new source" coal mines falls within our section 509 jurisdiction as exercised in American Iron & Steel Institute v. EPA (AISI I), 526 F.2d 1027 (3d Cir. 1975), cert. denied, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978), and American Iron & Steel Institute v. EPA (AISI II), 568 F.2d 284 (3d Cir. 1977), and as defined in our earlier opinion in this case.
 
 
 29
 The contested regulation was promulgated on the authority of section 306 of the Act, 33 U.S.C. § 1316, which defines a new source as:
 
 
 30
 any source, the construction of which is commenced after the publication of proposed regulations prescribing a standard of performance under this section which will be applicable to such source, if such standard is thereafter promulgated in accordance with this section.
 
 
 31
 Id. § 1316(a)(2). In the promulgated standard, however, the EPA noted that promulgation of the regulations was delayed for more than one hundred twenty days after publication of proposed regulations because the agency needed additional time to address the substantial number of comments received on its proposal. It therefore made the effective date of the new source regulations the date of promulgation rather than the date of proposal. 44 Fed.Reg. 2587, 2589-90 codified at 40 C.F.R. § 434.11(i) (1979).
 
 
 32
 The Act provides that when the Administrator designates a category of sources, here coal mines, as subject to section 306, then "(a)s soon as practicable, but in no case more than one year" thereafter he "shall propose and publish regulations establishing Federal standards of performance for new sources within such category." 33 U.S.C. § 1316(b)(1)(B). "After considering . . . comments, he shall promulgate, within one hundred and twenty days after publication of such proposed regulations, such standards with such adjustments as he deems appropriate." Id. The quoted time limits are couched in mandatory language. The same subsection states that "(s)tandards of performance, or revisions thereof, shall become effective upon promulgation." Id.
 
 
 33
 Petitioners urge that the effective date provision in section 306(b)(1)(B) must be read together with the new source definition in section 306(a)(2) quoted above; that is, the regulations apply upon promulgation to all new sources constructed after the standards are proposed. Otherwise, they argue, the mandatory time limits in section 306(b)(1)(B) will be easily circumvented. Thus, they urge, the EPA cannot rely on its own foot dragging as a reason for avoiding application of the promulgated standards to new sources constructed between the date of proposal and the date of promulgation. EPA, on the other hand, contends that taking into account its budgetary restraints and the technical subject matter with which it deals, we should read the deadlines and effective date provision in section 306 as directory only. Otherwise, EPA suggests, it will merely avoid the deadlines and the effective date provision by reproposing and repromulgating standards. As the government brief puts it:
 
 
 34
 In the present case, the only way in which the 120 day period between proposal and promulgation prescribed by section 306(b)(1)(B) could have been met would have been to repropose and then repromulgate the regulations less than 120 days thereafter.
 
 
 35
 Brief for Appellee at 19.
 
 
 36
 We start our analysis with the plain language of the statute. Section 306 requires that once a category of sources has been identified by the Administrator as subject to the section, regulations governing new sources within that category must be proposed within one year. In equally mandatory terms, the section requires promulgation of the regulations within one hundred and twenty days after proposal and defines a "new source" as one the construction of which was commenced after proposal of regulations, "if such (regulations are) thereafter promulgated in accordance with this section." 33 U.S.C. § 1316(a)(2). Seizing upon this quoted provision, EPA argues that its failure to promulgate within one hundred and twenty days is a failure to promulgate in accordance with the section which renders the statutory new source definition inapplicable. The legislative history of the Act reveals that the original Senate bill defined new sources solely with reference to the date of proposal of the regulations, see Legislative History of the Federal Water Pollution Control Act Amendments of 1972 at 1623-24 (1973) (hereinafter Legislative History ) (reprinting S. 2770). The House bill added the above-quoted language, see id. at 990 (reprinting H.R. 11896), which was ultimately adopted in Conference. See id. at 42 (reprinting Pub.L. No. 92-500, § 306(a) (2)). Nothing in the legislative history discloses the reason for the addition of the quoted language. What is clear, however, is that Congress intended to subject as many firms as possible to the new source regulations, as evidenced by the various reports that accompanied section 306(a). See H.R.Rep.No.92-911, 92d Cong., 2d Sess. 110-12, reprinted in Legislative History at 797-99 (reflecting intent to "preclude construction of new sources . . . which use less than the best available control technology" and defining new sources as those "for which the construction . . . is commenced after the publication of proposed regulations prescribing a standard of performance under section 306"); S.Rep. No. 92-414, 92d Cong., 1st Sess. 57-60, reprinted in Legislative History at 1475-78 ("The overriding purpose of this section would be to prevent new water pollution problems, and toward that end, maximum feasible control of new sources, at the time of their construction, is considered by the Committee to be the most effective and, in the long run, the least expensive approach to pollution control"); cf. S.Conf.Rep.No.92-1236, 92d Cong., 2d Sess. 127-29, reprinted in Legislative History at 310-12 (expressly embodying intent of both houses with regard to meaning of § 306).
 
 
 37
 Although the legislative history is inconclusive, the time limit appears to serve a dual purpose. It advances the public interest in a prompt abatement of polluting discharges. It also serves to limit the period during which businesses contemplating construction, put on notice by a proposal for a standard, are left in a state of uncertainty with respect to final agency action. Congress said, in effect, that it is not unreasonable, once a business has been put on notice of a proposed standard affecting it, for that business to pattern its conduct for four months to the likely application of the standard. We reject the government's suggestion that it can postpone indefinitely the period of uncertainty by the expedient of periodic reproposal.
 
 
 38
 Assuming such a congressional purpose for the one hundred and twenty day provision in section 306, the next question is the consequence of EPA failure to meet that deadline. There are several alternative possibilities. That espoused by EPA here is the recognition of its power to disregard entirely the provision in section 306 defining new sources as those constructed after proposal of standards, and to apply the standards only to post-promulgation construction. The effect of such recognition, however, is to place possibly competing businesses, equally on notice of a proposed standard, in different positions because one took a chance on starting construction in the meantime while the other did not. Such a policy would conflict with our analysis of the Act in AISI II, 568 F.2d at 307-08, and with the Supreme Court's indication that escape from the standards of section 306 should be minimized. See E. I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 137-39, 97 S.Ct. 965, 979-980, 51 L.Ed.2d 204 (1977) (holding that Congress intended that no new source may be granted a variance from § 306 standards). A second possibility is to hold that the one hundred and twenty day provision in section 306(b)(1)(B) shall be read into the new source definition in section 306(a)(2). This would mean that if promulgation were delayed for more than one hundred and twenty days the standard would apply only to new construction commenced in the last one hundred twenty days before promulgation. While that construction would give some effect to the congressional intention to make standards applicable to those businesses which go forward in the face of notice of the proposed regulation, it would, like the EPA construction of section 306, draw an arbitrary line between businesses, equally on notice, on the basis of when they took the chance of starting construction. Neither of these constructions seems consistent with the public interest in maximizing elimination of sources of pollution. Neither, moreover, is consistent with the policy we recognized in AISI I and AISI II of preventing the exemption from coverage of the Act of a group of businesses, that should have been included, to the disadvantage of their competitors. The third construction, that espoused by petitioners, is that section 306 means what it says; that the proposal of new source standards puts the world on notice, and that the regulations, whenever promulgated, apply to all who have been put on notice.
 
 
 39
 We conclude that this last construction is the only one consistent with the basic policies of the Act. It is not at all unfair, because businesses contemplating new construction which may be covered by the proposed standards are put on notice.[1] EPA acknowledges, it is true, that its record of compliance with the one hundred and twenty day limitation is less than perfect. Thus some businesses may, because of agency inaction, be left in a state of uncertainty for a time longer than Congress contemplated. But those businesses are not without remedy. They can resort to the district court under the citizens' suit provisions of section 505 of the Act to compel agency compliance with the spirit if not with the letter of the section 306 time limits. Natural Resources Defense Council, Inc. v. Train, 166 U.S.App.D.C. 312, 333, 510 F.2d 692, 713 (D.C.Cir.1975). Given the availability of that remedy we see no reason for construing section 306 in a manner which distorts its plain meaning. That plain meaning is that promulgated new source standards apply to construction commenced after publication of proposed regulations. If the agency fails to meet the one hundred and twenty day time limit, the remedy is a section 505 suit in the district court to compel prompt agency action.
 
 
 40
 The petition for review in No. 79-1466, insofar as it challenges that provision in the new source standards for coal mines making them effective only as to construction commenced after the date of promulgation rather than after the date of proposal will be granted, and the case remanded to EPA for modification of the promulgated regulations in accordance with this opinion. In all other respects the petition for review will be denied for the reasons set forth in our prior opinion.
 
 
 
 [1]
 On July 9, 1979, this court stayed all proceedings in the third case consolidated in this appeal, No. 79-1457, pending repromulgation of certain regulatory provisions which had been temporarily suspended. See 44 Fed.Reg. 39,391 (1979). Petitioner in that matter, the National Coal Association, appeared instead on this appeal as an intervenor-respondent
 
 
 [2]
 The regulations thus provide, for example, that with respect to the subcategories of acid ferruginous drainage and alkaline mine drainage, "drainage which is not from an active mining area shall not be required to meet the limitations set forth." 44 Fed.Reg. 2586, 2590, codified at 40 C.F.R. §§ 434.35(c), 434.45(c) (1979). Moreover, section 434.11(b), by defining "active mining area(s)," specifically limits applicability of the regulations so as to exclude post-mining discharges. 40 C.F.R. § 434.11(b) (1979). The Administrator's comments, appended to the final rules published in the Federal Register, note that EPA "will study the post-mining discharge problem and promulgate standards" in connection with its statutorily-mandated review of the category with respect to the best available technology standards. 44 Fed.Reg. at 2592. Petitioners apparently do not challenge the establishment of a separate subcategory for post-mining discharges; they object only to the Administrator's decision to defer promulgation of regulations applicable to that subcategory
 
 
 [3]
 Compare 33 U.S.C. § 1369 with 29 U.S.C. § 660 (Occupational Safety and Health) and 28 U.S.C. § 2349 (general court of appeals jurisdiction to review federal agency orders)
 
 
 [4]
 See S.Conf.Rep.No.92-1236, 92d Cong., 2d Sess. 145-46 reprinted in Legislative History of the Federal Water Pollution Control Act Amendments of 1972 281, 328-29 (1973) (hereinafter Legislative History ) (Conference Committee report concerning § 505); id. at 147-48, reprinted in Legislative History at 330-31 (Conference Committee report concerning § 509), H.R.Rep.No.92-911, 92d Cong., 2d Sess. 132-34, reprinted in Legislative History at 819-21 (House Report concerning § 505); id. at 135-36, reprinted in Legislative History at 822-23 (House Report concerning § 509); S.Rep.No.92-414, 92d Cong., 1st Sess. 79-82, reprinted in Legislative History at 1497-1500 (Senate Report concerning § 505); id. at 84-85, reprinted in Legislative History at 1502-03 (Senate Report concerning § 509)
 
 
 [5]
 See S.Conf.Rep.No.92-1236, 92d Cong., 2d Sess. 127-29, reprinted in Legislative History at 310-12; H.R.Rep.No.92-911, 92d Cong., 2d Sess. 110-12, reprinted in Legislative History at 797-99; S.Rep.No.92-414, 92d Cong., 1st Sess. 57-60, reprinted in Legislative History at 1475-78
 
 
 [6]
 The regulations at issue in EDF were effluent standards promulgated under section 307 of the Act, 33 U.S.C. § 1317. Such standards are reviewable in the court of appeals pursuant to section 509(b)(1)(C). Id. § 1369(b)(1)(C). That section permits direct review in the court of appeals of "the Administrator's action . . . in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title." Id. Thus, the jurisdictional issue before the District of Columbia Circuit in EDF is indistinguishable from that presented herein
 
 
 [7]
 Environmental Defense Fund v. EPA, 194 U.S.App.D.C. 143, 172 & n.107, 598 F.2d 62, 91 & n.107 (D.C. Cir. 1978) citing Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 386 n.21, 541 F.2d 1, 14 n.21 (D.C. Cir.) (Clean Air Act), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976)
 
 
 [8]
 Environmental Defense Fund v. EPA, 194 U.S.App.D.C. at 172, 598 F.2d at 91, citing Natural Resources Defense Council v. Train, 171 U.S.App.D.C. 151, 155, 519 F.2d 287, 291 (D.C. Cir. 1975) (relying on Administrative Procedure Act)
 
 
 [9]
 E.g., Consolidation Coal Co. v. Costle, 604 F.2d 239, 250-53 (4th Cir. 1979); Appalachian Power Co. v. Train, 545 F.2d 1351, 1358-60 (4th Cir. 1976); American Iron & Steel Inst. v. EPA, 526 F.2d 1027, 1057 (3d Cir. 1975)
 
 
 [10]
 See Appalachian Power Co. v. Train, 545 F.2d at 1358-59 (reviewing adequacy of variance clause in regulation); American Iron & Steel Inst. v. EPA, 526 F.2d at 1057 (reviewing adequacy of regulations that established permissible daily variance but failed to establish average monthly variance)
 
 
 [11]
 The reported decisions in the two American Iron & Steel cases do not discuss the jurisdictional question
 
 
 [12]
 The AISI I case thus was a part of a general debate in environmental litigation with respect to whether the courts of appeals would have section 509 jurisdiction over section 304 promulgations. Since section 509 grants review of effluent limitations established under section 301 and does not mention section 304, the court first established that a section 304 limitation was promulgated under the general authority granted in section 301 and thus was directly reviewable in the court of appeals. 526 F.2d at 1035-46. Many of the cases relied on by petitioners in the instant case, however, are also technically concerned only with the 301-304 debate and are therefore inapposite. E.g., Tanners' Council v. Train, 540 F.2d 1188, 1190-91 (4th Cir. 1976); American Frozen Food Inst. v. Train, 176 U.S.App.D.C. 105, 127, 539 F.2d 107, 129 (D.C. Cir. 1976); Hooker Chem. & Plast. Corp. v. Train, 537 F.2d 620, 624-28 (2d Cir. 1976); Natural Resources Defense Council v. EPA, 537 F.2d 642, 644 (2d Cir. 1976); CPC Int'l, Inc. v. Train, 515 F.2d 1032, 1036-45 (8th Cir. 1975)
 
 
 [1]
 We reserve judgment on the issue, not presented in the instant case, of the proper interpretation of the Act in circumstances involving the combination of a substantial time deviation and a substantial change in the substance of the regulations between the dates of proposal and of promulgation