749 F.2d 549
 21 ERC 2222, 15 Envtl. L. Rep. 20,146
 TRUSTEES FOR ALASKA and Gilbert M. Zemansky, Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Alaska Miners Association, Inc., Intervenor.
ALASKA MINERS ASSOCIATION, INC., Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Trustees for Alaska, et al., Intervenors.
 Nos. 83-7764, 83-7961.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 21, 1984.
Decided Dec. 10, 1984.
 
 Jeffrey M. Eustis, Randall E. Farleigh, Farleigh & Waldock, Anchorage, Alaska, for petitioners.
 Margaret B. Silver, E.P.A., Scott Slaughter, U.S. Dept. of Justice, Land & Nat. Resources Div., Washington, D.C., for respondent.
 Petition for Review of Decision of the Administrator of the Environmental Protection Agency.
 Before CHAMBERS, FERGUSON and BEEZER, Circuit Judges.
 FERGUSON, Circuit Judge:
 
 
 1
 These consolidated cases involve petitions for review of approximately 170 National Pollutant Discharge Elimination System (NPDES) permits issued by the Environmental Protection Agency (EPA) to Alaska gold placer miners in 1976 and 1977.
 
 I. BACKGROUND
 A. Placer Mining
 
 2
 A "placer" is an alluvial or glacial deposit containing particles of gold. Placer mining to remove the gold is often done on a large scale. The average mining operation requires an investment of $250,000 to $500,000 for bulldozers, a front-end loader, sluice box, airplane, airfield and buildings. Mining sites are usually in remote areas; many have no access by road. Miners remove surface soil and vegetation, then excavate the gold-bearing material (pay dirt) from the placer deposit. Next, the miners remove the gold from the pay dirt by a gravity separation process known as sluicing. Miners place the pay dirt in a sluice box, which is a channel having small submerged dams or riffles attached to its bottom. When rapidly moving water flows through the sluice box, the heavier particles, including gold, are caught in the riffles. Lighter materials, including sands, silts, and clays remain suspended in the waste water released from the end of the sluice box.
 
 
 3
 Untreated discharge water from these large-scale operations can kill fish and ruin their habitats before the suspended materials eventually settle out. The increased sediment load can alter stream flows or cause flooding and covering of historic sites. In addition, placer mining may release toxic arsenic and mercury into streams. Mercury is sometimes used in placer mining operations to increase the settling of gold-bearing materials. If mercury is added to the water flowing through the sluice box, it may contaminate the waste water. Arsenic apparently occurs in conjunction with some gold deposits in Alaska and may be released as a result of mining activities.
 
 B. The Federal Water Pollution Control Act
 
 4
 Numerous opinions construing the statute have traced the history of the Federal Water Pollution Control Act (Act) and its amendments, e.g., EPA v. State Water Resources Control Board, 426 U.S. 200, 202-09, 96 S.Ct. 2022, 2023-26, 48 L.Ed.2d 578 (1976); Montgomery Environmental Coalition v. Costle, 646 F.2d 568 (D.C.Cir.1980). We thus review its provisions only briefly. In 1972, Congress enacted amendments to the Federal Water Pollution Control Act, Pub.L. No. 92-500, 86 Stat. 816, codified at 33 U.S.C. Secs. 1251-1376, declaring the "national goal that the discharge of pollutants into the navigable waters be eliminated by 1985," Sec. 1251(a)(1). The Act established a comprehensive scheme for federal regulation of water pollution, the National Pollution Discharge Elimination System, as a means of achieving and enforcing effluent limitations. Under the NPDES, it is unlawful to discharge a pollutant without obtaining a permit and complying with its terms. Sec. 1311(a). For permits issued before July 1, 1977, as were those in this case, the Act requires limitations based on application of the "best practicable control technology currently available" (BPT), Sec. 1311(b)(1)(A). By July 1, 1984, the Act requires industry to achieve effluent limitations for specified pollutants based on the application of the more stringent "best available technology economically achievable" (BAT), Sec. 1311(b)(2)(A). With regard to other pollutants identified pursuant to Sec. 1314(b)(4), effluent limitations after July 1, 1984 require application of the best conventional pollutant control technology (BCT), Sec. 1311(b)(2)(E).
 
 
 5
 No industry-wide, nationally applicable effluent limitations have yet been promulgated for the placer mining industry. However, the Act authorizes the EPA to issue permits on a case-by-case basis upon "such conditions as the Administrator determines are necessary to carry out the provisions of this [Act]." 33 U.S.C. Sec. 1342(a)(1). In making this determination, the Agency must consider:
 
 
 6
 [T]he total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, ... the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate.
 
 
 7
 33 U.S.C. Sec. 1314(b)(1)(B).
 
 C. Procedural History
 
 8
 Under former 40 C.F.R. Sec. 125.36 (1978), any interested person who has specified an interest which would be affected by the proposed issuance, denial, or modification of a permit could be joined as a party. Pursuant to that regulation, Gilbert M. Zemansky requested an adjudicatory hearing to review approximately 170 NPDES permits issued in 1976 and 1977 to Alaska placer miners. Zemansky is a resident of Alaska who uses for recreational purposes a number of streams where placer mining operations are conducted. The Trustees for Alaska joined the action. The Trustees for Alaska (Trustees) is an organization established and supported by persons interested in using and protecting the Alaskan environment. Members and employees of the organization use the streams which are subject to placer mining discharge for subsistence and recreation. The Trustees and Zemansky contended that the permits were too lenient and that the EPA should have required the miners to eliminate discharge entirely by recycling sluice water. Recycling is accomplished by pumping waste water which collects in a settling pond back to the site of the mining operation.
 
 
 9
 The Alaska Mining Association also joined the action. The Alaska Mining Association (Miners) is a trade organization which represents the mining industry in Alaska. Approximately 40 of the permittees are or have been members of the organization. The Miners protested that the permit conditions were too stringent and that no discharge limitations should have been imposed. In order to achieve the 0.2 ml/l limitation on settleable solids, each miner would have to construct a settling pond where waste water discharges from mining operations would be impounded for a period of time to allow silt, sand, and clay particles to "settle out" before the waste water is returned to the receiving waters. The amount of particles that settle out while in the pond depends upon the pond's holding capacity and the period of time that the waste water is held there. The type of settling pond envisioned in the permits would require waste water to be held for a 24-hour period and would have the capacity to hold one day's water use. The miners argue that the costs of constructing and maintaining such ponds is prohibitive. Moreover, according to the Miners, there are topographical constraints which make the construction of settling ponds impracticable or, in some instances, impossible.
 
 
 10
 Although the Miners raised additional statutory and constitutional arguments for limiting the EPA's action, the Administrative Law Judge (ALJ) limited the issues for the hearing to questions of best practicable control technology. The ALJ reserved the parties' rights to raise the stricken issues on appeal. The ALJ held an initial adjudicatory hearing in October 1977. Based on the ALJ's findings, the Regional Administrator issued an initial decision in October 1978, upholding the terms of the permits.
 
 
 11
 The Trustees and the Miners petitioned the Administrator of the EPA for review. On March 1980, the Administrator issued his decision on review. The Administrator remanded for determination whether recycling constitutes BPT. The hearing on remand was held in March and June 1981; the presiding officer issued an Initial Decision on Remand on March 17, 1982. The presiding officer held that zero discharge from recycling was not "practicable." The effect of this decision was to uphold the use of settling ponds as BPT. The Administrator ultimately denied review and the Initial Decision on Remand became final on September 20, 1983. The Trustees and Zemansky petitioned for review in this court; the court consolidated their petitions.
 
 D. The Permits
 
 12
 Each of the permits issued in 1976-77 had identical effluent limitations, monitoring requirements, and reporting requirements. The permits required the miners to treat waste water so that the maximum daily concentration of settleable solids was 0.2 milliliters per liter (ml/l). The permits incorporated the State of Alaska's water quality standard, which limits the increase over natural turbidity to 25 Jackson Turbidity Units (JTU) at a point 500 feet downstream from the discharge point, but did not limit arsenic or mercury discharge.
 
 
 13
 The permits required the miners to conduct periodic monitoring of the discharge water for the concentration of settleable solids, to report the results of their testing to the EPA enforcement division and the State of Alaska, and to allow the State and the EPA to inspect the permittees' premises and to review their records. These permits expired under their own terms after five years. They no longer have any practical or legal effect.
 
 
 14
 The EPA issued a second set of permits in 1983 with different effluent limits and conditions. These permits have also expired. The EPA dismissed the Trustees' request for an adjudicatory hearing; the Trustees did not appeal the dismissal.
 
 
 15
 On June 7, 1984, the EPA issued permits for 1984. These permits differ from both earlier sets in their discharge limitations and monitoring conditions. These permits are not yet final for purposes of judicial review; EPA administrative proceedings are still pending.
 
 II. DISCUSSION
 A. Standing
 
 16
 The petitioners are not themselves permittees; thus, their standing to bring this suit is a threshold inquiry. The Act broadly states that any "interested person" can seek review in the court of appeals of certain decisions of the Administrator. 33 U.S.C. Sec. 1369(b)(1). In its well reasoned opinion in Montgomery Environmental Coalition, 646 F.2d at 578, the D.C. Circuit held that the term "interested persons" incorporates the injury-in-fact rule for standing set out in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). That rule requires that a person seeking review must allege facts showing that he or she is adversely affected by the challenged action. Such injury may be to one's "[a]esthetic and environmental well-being," id. at 734, 92 S.Ct. at 1365, as well as to one's economic interest. We adopt the analysis of Montgomery Environmental Coalition, and conclude that Zemansky, the Trustees, and the Miners have satisfied the requirement for standing. All were properly joined as parties to the administrative proceedings pursuant to former 40 C.F.R. Sec. 125.36 (1978).
 
 B. Mootness
 
 17
 The petitioners have sought this court's jurisdiction under Sec. 1369(b), which provides for review in the court of appeals of specified actions of the Administrator, including issuing permits. However, the challenged permits, issued in 1976 and 1977 for a period of five years, have expired by their own terms. Thus, a second threshold question arises whether the petitioners have presented a live controversy; federal courts have no jurisdiction to decide moot questions. DeFunis v. Odegaard, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974) (per curiam).
 
 
 18
 In Montgomery Environmental Coalition, 646 F.2d 568 (D.C.Cir.1981), the court considered the issue of the mootness of challenges to expired NPDES permits. The court noted that because a controversy concerning an initial permit may continue in the context of succeeding permits, the courts may decide issues that are technically moot, but "capable of repetition, yet evading review." Id. at 579 (quoting Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)). This exception to the mootness doctrine applies when:
 
 
 19
 (1) [T]he challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.
 
 
 20
 Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam). In this case, the delays were inordinate; the 1976 permits were issued for a term of five years, but did not become final actions of the Administrator for purposes of judicial review until late in 1983. Subsequent permits have been issued for shorter terms. If EPA administrative review procedures continue to be too slow to bring a permit challenge to maturity before the permit expires, the petitioners may never obtain judicial review. Cf. Montgomery Environmental Coalition, 646 F.2d at 581 (detailing the "sorry history" of procedural delay in a challenge to NPDES permits). Thus, we hold that the first condition for the exception to apply is met.
 
 
 21
 Next, we examine whether the parties are likely to be subjected to the same action again. In doing so, we discuss each of the petitioners' claims separately.
 
 1. CLAIMS OF TRUSTEES AND ZEMANSKY
 
 22
 a. Burden of Proof
 
 
 23
 The Trustees claim that on remand the presiding officer erroneously required the Trustees to bear the risk of nonpersuasion on the issue of the use of recycling as BPT. Since these permits were initially issued, the EPA has promulgated revised regulations clarifying where the burden of persuasion is placed:
 
 
 24
 The permit applicant always bears the burden of persuading the Agency that a permit authorizing pollutants to be discharged should be issued and not denied. This burden does not shift.
 
 
 25
 40 C.F.R. Sec. 124.85(a)(1) (1983). Even if the presiding officer erred by failing to apply this regulation during the 1981 hearings on remand, the Trustees and the EPA now agree that the regulation provides the controlling legal principle. Thus, there is little danger that the principle will be misapplied in the future. This aspect of the Trustees' challenge is moot. See Montgomery Environmental Coalition, 646 F.2d at 583.
 
 
 26
 b. Settling Ponds as Best Practical Technology
 
 
 27
 The Trustees contend that the presiding officer erred by finding that use of settling ponds rather than recycling was BPT. The situation has now changed with respect to the statutory requirements. As of July 1, 1984, more stringent technological standards of BAT and BCT govern effluent discharge, Sec. 1311(b)(2)(A) and (E); BPT is no longer the controlling standard.
 
 
 28
 The Trustees concede that the current administrative proceedings to review the 1984 permits will develop an entirely new factual record and will apply a different legal standard. In view of the intervening change in the controlling standard and the corresponding staleness of the evidence, we conclude that the Trustees' assertion that recycling is BPT has become moot. See Montgomery Environmental Coalition, 646 F.2d at 585.
 
 
 29
 c. Additional Effluent Limitations and Monitoring Requirements
 
 
 30
 Under Sec. 1311(b)(1)(C), the EPA must adopt any limitation that has been established under state or federal law, or that is necessary to implement the Act's water quality standards, if the limitation is more stringent than existing limitations. The Trustees charge that despite the EPA's statutory duty and the express instructions of the Administrator's remand order, the presiding officer failed to establish effluent limitations for total suspended solids or for turbidity, arsenic, and mercury.
 
 
 31
 The permits incorporated the State of Alaska's water quality standard for turbidity allowing for an increase of no more than 25 Jackson Turbidity Units 500 feet downstream from the discharge point. The Trustees argue that a water quality standard is not sufficient, and that the Act requires the EPA to establish an end-of-pipe effluent limitation.
 
 
 32
 This issue is not moot. In subsequent permits issued in 1983 and 1984 the EPA has continued to include limitations based on state water quality standards, rather than effluent limitations, not only for turbidity but also for arsenic. In Montgomery Environmental Coalition, 646 F.2d at 580-81, the EPA had adopted the flat position that it was not legally bound to impose certain NPDES permit conditions. The court held that the EPA's categorical legal stance amounted to a "continuing and brooding presence, cast[ing] what may well be a substantial adverse effect on the interests of the petitioning parties." Id. (quoting Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974)). In such circumstances, the fact that the original permit had expired was held to be irrelevant because of the "highly reasonable expectation that petitioners will be subjected to the same action again." Montgomery Environmental Coalition, 646 F.2d at 581.
 
 
 33
 Thus, we reach the merits of the Trustees' claims on this issue. The EPA adopts the position that the incorporation of state water quality standards satisfies the need to establish effluent limitations. The Act provides:
 
 
 34
 In order to carry out the objective of this chapter, there shall be achieved ... (C) not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations ... or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this chapter.
 
 
 35
 33 U.S.C. Sec. 1311(b)(1)(C).
 
 
 36
 The Act defines "effluent limitation" as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources ... including schedules of compliance." 33 U.S.C. Sec. 1362(11).
 
 
 37
 In EPA v. State Water Resources Control Board, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), the Court discussed the role of effluent limitations in fulfilling the purposes of the Act. The Court observed that the 1972 amendments to the Act were prompted by the inadequacy of previous water quality standards which "focused on the tolerable effects rather than the preventable causes of water pollution," id. at 202, 96 S.Ct. at 2023. Under the amendments, a discharger's performance is measured against strict technology-based effluent limitations rather than against limitations based on collective water quality standards. Id. at 204-05, 96 S.Ct. at 2024-25. See S.Rep. No. 98, 92d Cong., 1st Sess. 5, reprinted in 1972 U.S.Code Cong. & Ad.News 3675 ("Under this Act the basis of pollution prevention and elimination will be the application of effluent limitations. Water quality will be a measure of program effectiveness and performance, not a means of elimination and enforcement."). See also Bethlehem Steel Corp. v. EPA, 538 F.2d 513, 515 (2d Cir.1976) (In holding that it lacked jurisdiction to review action of EPA in approving state water quality standards, the court observed that although water quality standards and effluent limitations are related, the two are entirely different concepts). Effluent limitations are a means of achieving water quality standards.
 
 
 38
 In United States Steel Corp. v. Train, 556 F.2d 822 (7th Cir.1977), the court reviewed an NPDES permit which included temperature limitations taken directly from state water quality standards. In response to the argument that these limitations were therefore not effluent limitations, the court reasoned that "[b]ecause of the convenience of temperature limits, thermal water quality standards do not need to be 'translated' in order to become applicable to an individual discharger as effluent limitations." Id. at 840 n. 27. The situation differs here because the particulate solids at issue may easily be translated into effluent limitations through other units of measurement such as by weight or volume. Thus, we hold that section 1311(b)(1)(C) requires the Administrator to include in placer mining permits whatever effluent limitations it determines are necessary to achieve the state water quality standards.
 
 
 39
 The 1976 permits included no effluent limitations for arsenic and mercury. The information submitted with the permit applications did not indicate that either metal was a substantial factor in waste water. Nonetheless, the Trustees have introduced evidence showing significant increases in arsenic downstream from nine of the ten sites examined and in mercury downstream from one of the ten sites.
 
 
 40
 In the Initial Decision on Remand, the presiding officer directed that the permits be amended to include monitoring requirements for mercury and arsenic for at least one mining season to determine what levels are found when the settleable solids limitations and state turbidity standards are met. However, he required no effluent limitation for arsenic and mercury even at the sites where it had already been shown to be present. In reaching this decision, the presiding officer denied the Trustees an opportunity to present in a public hearing their case for proposed effluent limitations or monitoring requirements for arsenic and mercury, as required by section 1342 and by the Administrative Procedure Act, 5 U.S.C. Secs. 554, 556, and 557. See Marathon Oil Co. v. EPA, 564 F.2d 1253, 1260 (9th Cir.1977).
 
 
 41
 The Trustees assert that this denial of their rights continues to cause them harm in the context of succeeding permits which still fail to restrict effluent limitations on arsenic and mercury discharge and require no monitoring for those pollutants. We find that this argument is meritorious. Thus, we direct the Administrator on remand to conduct a hearing for the purpose of allowing the Trustees to present evidence on effluent limitations for arsenic and mercury and on appropriate monitoring requirements.
 
 2. MINERS' CLAIMS
 
 42
 a. Placer Mines as "Point Sources" of Pollution
 
 
 43
 The Miners argue that their activities are exempt from NPDES permit requirements because mining is a nonpoint source of pollution and the prohibition against discharge of pollutants, see Sec. 1311(a), applies only to "point sources," Sec. 1362(12), defined as "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." Sec. 1362(14). Another section of the Act discusses nonpoint sources, which encompasses "mining activities, including runoff and siltation from new, currently operating, and abandoned surface and underground mines." Sec. 1314(f)(2)(B). These specified activities are not subject to NPDES permit requirements; rather, the Act directs the Administrator only to develop guidelines for identifying and controlling such sources. Thus, the Miners argue that requiring permits for placer mining is beyond the EPA's statutory authority.
 
 
 44
 The Tenth Circuit rejected a similar challenge in United States v. Earth Sciences, Inc., 599 F.2d 368 (10th Cir.1978), a case involving overflow of a toxic leachate solution at a gold mining operation. The court reviewed the legislative history of the Act, and noted that Congress had rejected an amendment that would have regulated mining discharge from point sources on the ground that it duplicated the Act's general regulatory provisions. Id. at 372 (citing Staff of Senate Comm. on Public Works, 93d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972, 530-535 (Comm. Print 1973)). The court observed that Congress had classified nonpoint source pollution as runoff caused primarily by rainfall around activities that employ or create pollutants. Such runoff could not be traced to any identifiable point of discharge. Earth Sciences, 599 F.2d at 373. The court concluded that point and nonpoint sources are not distinguished by the kind of pollution they create or by the activity causing the pollution, but rather by whether the pollution reaches the water through a confined, discrete conveyance. Thus, when mining activities release pollutants from a discernible conveyance, they are subject to NPDES regulation, as are all point sources. Id. Accord Sierra Club v. Abston Construction Co., 620 F.2d 41, 44 (5th Cir.1980) (coal strip mines). Here, discharge water is released from a sluice box, a confined channel within the statutory definition. We adopt the analysis of Earth Sciences and hold that the EPA did not exceed its authority in issuing these permits.
 
 
 45
 b. The EPA's Duty to Promulgate Industry Effluent Limitations Guidelines
 
 
 46
 The Act authorized the EPA to promulgate regulations establishing effluent limitations guidelines applicable to specific polluting industries. Secs. 1311, 1314. However, the EPA has not yet promulgated regulations governing the placer mining industry. Rather, the EPA has determined effluent limitations when issuing NPDES permits. Under Sec. 1342(a)(1), the Administrator may issue permits incorporating "such conditions as the Administrator determines are necessary to carry out the provisions of this [Act]," when no limitations or guidelines are yet available. See United States Steel Corp. v. Train, 556 F.2d 822, 844 (7th Cir.1977); Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692, 709-10 (D.C.Cir.1975).
 
 
 47
 The Miners argue that the EPA has used adjudicatory hearings on permit applications to evade its rulemaking responsibilities under the Act. The Miners claim that the EPA's failure to issue effluent guidelines results in prejudice and deprivation of due process in that they have not had the public notice and public input protections of formal rulemaking. The Miners request this court to direct the EPA to promulgate appropriate guidelines prior to issuing individual permits.
 
 
 48
 The Miners' argument is framed in terms of the EPA's failure to comply with a nondiscretionary duty to promulgate industry-wide rules. Other courts have upheld this duty. See, e.g., Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692 (D.C.Cir.1975). However, the Act confers jurisdiction on the federal district courts, not courts of appeal, to review any action "where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator." Sec. 1365(a)(2). This grant of jurisdiction is exclusive. In Pennsylvania Department of Environmental Resources v. EPA, 618 F.2d 991 (3rd Cir.1980), the petitioners sought review in the court of appeals under Sec. 1369(b) (review of final actions of the Administrator) of certain regulations promulgated by the EPA. The court held that the jurisdictional provisions of Secs. 1365(a)(2) and 1369(b) did not overlap. Id.; accord Environmental Defense Fund v. EPA, 598 F.2d 62, 91 (D.C.Cir.1978). Thus, the Miners must bring an action in the district court if they seek to require the EPA to promulgate point source standards.
 
 
 49
 c. Burden of Proof
 
 
 50
 The Miners also raise a challenge based on the burden of proof in permit hearings. The Miners contend that the current regulation, 40 C.F.R. Sec. 124.85, requiring a permit applicant to bear the burden of persuading the agency that a permit should issue, is invalid. The Miners contend that under the regulation they are faced with the choice of deciding whether to accept the agency's proposed standards, even if excessive, or to challenge those standards but risk incriminating themselves by admitting their inability to comply with current permit conditions. The Miners argue that this dilemma deprives them of due process.
 
 
 51
 We conclude that this challenge is not moot; the Miners would have no other way of obtaining review if an invalid regulation were applied against them in future hearings.
 
 
 52
 Nonetheless, the Miners have not raised a timely challenge to this regulation. Section 1369(b)(1)(E) authorizes the courts of appeals to review the promulgation of "any effluent limitation or other limitation under section 1311, 1312, or 131 of this title." Such challenges must be raised within 90 days, however. "[E]ffluent limitation or other limitation" has been interpreted to include more than numerical limitations. In National Resources Defense Council, Inc. v. EPA, 673 F.2d 400 (D.C.Cir.), cert. denied, 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 143 (1982), the court, in deciding numerous consolidated challenges to the EPA's Consolidated Permit Regulations, 40 C.F.R. pts. 122-125 (1983), which include the regulation at issue here, held that those regulations were reviewable in the court of appeals under section 1369(b)(1)(E). Id. at 403-405. We adopt the D.C. Circuit Court's analysis in National Resources Defense Council, and thus we conclude that the Miners' claim is time-barred; the regulation in question was promulgated on June 7, 1979, 44 Fed.Reg. 32854.
 
 
 53
 d. Takings Issue
 
 
 54
 The Miners assert that under federal mining laws and Alaska water rights laws they have a protectible property right to run water through their sluice boxes, including a right to cause deterioration in the water quality downstream from their operations, and that Congress did not intend to repeal or modify this right when it enacted the Federal Water Pollution Control Act Amendments of 1972. Thus, the Miners claim, application of the permit conditions limiting discharge of pollutants results in a taking of their vested property rights without compensation, in violation of the Fifth Amendment.
 
 
 55
 We conclude that this question is not moot because it presents a legal question that is capable of repetition as subsequent permits are issued. However, even if we assume, without deciding, that placer miners have vested property rights in their historical use of water, the Miners have not presented a justiciable claim of an unconstitutional deprivation of property.
 
 
 56
 To determine whether a regulation of use effectuates an unconstitutional taking, we must examine whether the regulation substantially advances a legitimate state interest and whether the regulation allows the owner economically viable use of his property. Hodel v. Virginia Surface Mining & Reclamation Association, 452 U.S. 264, 295-96, 101 S.Ct. 2352, 2370-71, 69 L.Ed.2d 1 (1981). Clearly the NPDES permit requirements advance an important governmental interest, as articulated in Sec. 1251(a)(1).
 
 
 57
 However, the Miners have failed to present any concrete controversy concerning the application of the permit conditions to any particular operations or to any particular estimates of economic impact and ultimate valuation. See Hodel, 452 U.S. at 295, 101 S.Ct. at 2370. Mere diminution of property value as a result of regulation cannot by itself establish a taking, Agins v. City of Tiburon, 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 2143 n. 9, 65 L.Ed.2d 106 (1980), and the Miners have not even alleged that any of their members have been deprived of economically viable use of their property. See Hodel, 452 U.S. at 295-96, 101 S.Ct. at 2370-71.
 
 
 58
 e. Privilege Against Self-Incrimination
 
 
 59
 The Miners assert that the self-monitoring, reporting, and recordkeeping provisions of their permits infringe on their constitutional privilege against self-incrimination. This challenge is premature. The Supreme Court has announced that the doctrine that a person who claims that government demands for information will violate his privilege against self-incrimination must submit to the demands and expressly invoke the privilege in response to specific matters. Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 107-08, 81 S.Ct. 1357, 1416-17, 6 L.Ed.2d 625 (1961). See also California Bankers Association v. Shultz, 416 U.S. 21, 73-75, 94 S.Ct. 1494, 1523-1524, 39 L.Ed.2d 812 (1974) (following Communist Party, held that facial challenges to Bank Secrecy Act reporting requirements were premature). Because the Miners have not alleged any claim that the permit conditions were improperly applied in an actual case, we dismiss this challenge as unripe.
 
 
 60
 f. Fourth Amendment Challenge
 
 
 61
 The EPA incorporated in each permit a condition that the permittee must grant the State of Alaska and the EPA a right of access to the permittee's premises and must allow the state and the EPA to inspect the permittee's records. Congress has specifically authorized inspection of NPDES-permitted facilities for the purposes of carrying out the Act's regulatory scheme. 33 U.S.C. Sec. 1318(a).
 
 
 62
 The Miners contend that this permit condition infringes upon their rights under the Fourth Amendment to be free from unreasonable searches and seizures. We must dismiss this facial challenge on the ground that it is too speculative. The Miners have not even alleged that any search has occurred.
 
 
 63
 The Supreme Court in Donovan v. Dewey, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), announced that:
 
 
 64
 [T]he Fourth Amendment protects the interest of the owner of property in being free from unreasonable intrusions onto his property by agents of the government. Inspections of commercial property may be unreasonable if they are not authorized by law or are unnecessary for the furtherance of federal interests.
 
 
 65
 ....
 
 
 66
 [A] warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.
 
 
 67
 Id. at 599-600, 101 S.Ct. at 2538-2539. This language requires us to reject the Miners' facial challenge to the constitutionality of the permit conditions. The permits are capable of being applied in a constitutional manner. The First Circuit in United States v. Tivian Laboratories, Inc., 589 F.2d 49 (1st Cir.1978), cert. denied, 442 U.S. 942, 99 S.Ct. 2884, 61 L.Ed.2d 312 (1979), rejected a Fourth Amendment defense to the EPA's suit to obtain judicial enforcement of the EPA's request for information under section 1318. The Court noted that section 1318 was not self-enforcing. Upon a company's refusal to comply with a request for information, the EPA must seek a court enforcement order under section 1319(a)(3)(b). Id. at 53.
 
 CONCLUSION
 
 68
 We hold that the Administrator erred by failing to require an effluent limitation for turbidity and by failing to provide a public hearing on the question of effluent limitations for arsenic and mercury. We remand to the EPA for further proceedings consistent with this opinion.
 
 
 69
 We dismiss as moot all other challenges raised by Zemansky and the Trustees.
 
 
 70
 For the reasons discussed above, we dismiss each of the Miners' claims.
 
 
 71
 WE SO ORDER.